No. 23-13979-J

In The

# United States Court of Appeals
## For the Eleventh Circuit

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY **and**
STATE FARM FIRE AND CASUALTY COMPANY,

*Plaintiffs-Appellants,*

— v. —

MICHAEL THOMAS LAROCCA, D.C., ET AL.,

*Defendants-Appellants,*

On Appeal from the United States District Court for the
Middle District of Florida, Susan C. Bucklew, Senior District Judge

OPENING BRIEF OF PLAINTIFFS-APPELLANTS
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
AND STATE FARM FIRE AND CASUALTY COMPANY

Eric T. Gortner
Michael J. Powers
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
312-902-5200

Robert T. Smith
Andrew J. Pecoraro
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006
202-625-3500

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Plaintiff-Appellants hereby submit the following Certificate of Interested Persons and Corporate Disclosure Statement, and certify the following:

1.    State Farm Fire and Casualty Company is a wholly owned subsidiary of State Farm Mutual Automobile Insurance Company and has no other parent corporation.

2.    State Farm Mutual Automobile Insurance Company has no parent company and no publicly held company owns ten percent (10%) or more of the stock in State Farm Mutual Automobile Insurance Company.

3.    The following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, and any publicly held corporation that owns 10% or more of the party's stock:

All Accidents Chiropractic Center, PLLC

Bacaner, Tobias

Baroff, Aaron

Bucklew, Susan C. – Senior United States District Court Judge

i

Causey, Patrick

de Beaubieu, Simmons, Knight, Mantzaris, and Neal, LLP

DeSouza, Terri

DiPaolo, Catherine M.

Gerber, Mara

Goldsmith, John

Gortner, Eric. T.

Griffin, Ruth Germaine

Hunt, Jason Edward

Katten Muchin Rosenman LLP

Keough, Maria

LaRocca, Blake

LaRocca, Michael Thomas

LaRocca Auto Injury Center LLC

LaRocca Chiropractic Centers, LLC

LaRocca Chiropractic Injury Center LLC

LaRocca Injury Centers LLC

Major, Michael August

Mayberry, Savannah Jane

McCabe, Kyle Francis

Mountaineer Marketing and Management, Inc.

Muhs, Bradley A.

Pecoraro, Andrew J.

Porcelli, Anthony E. – United States Magistrate Judge

Powers, Michael J.

Raheb, Jeffrey Eduard

Reale, John W.

Rebein, Lori

Sells, Jessica

Semia, Mounir

Smith, Robert T.

State Farm Mutual Automobile Insurance Company

State Farm Fire and Casualty Company

Silverman, Ross O.

Stewart, Antoinette Denise

Tomassi, Marie

Torres-Ruiz, Cecilio

Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.

Valdes, Bart R.

Vayda, Stacie

ZZZ Abiding Marketing, LLC

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company respectfully request oral argument.

As the District Court recognized in staying its judgment, this appeal raises "a serious legal question of first impression and a concomitant possibility of success on the merits" under Florida's Health Care Clinic Act. Under that statute, an entity furnishing health care services must obtain a license or satisfy an exemption from licensure. An entity that violates the Act is not entitled to compensation for its services.

At issue here is the proper interpretation of an important and frequently invoked exemption from the Clinic Act's licensure requirements: An entity that is wholly owned by a health care practitioner need not apply for a license if, among other things, the entity's owner is "legally responsible for the entity's compliance with all federal and state laws." The main issue in this appeal is whether an owner who systematically and repeatedly pays kickbacks to induce referrals may nonetheless claim to have satisfied his legal responsibility for his entity's substantial compliance with two state laws—Florida's Anti-Kickback Statute and Patient Brokering Act.

Because this appeal raises important and recurring issues of first impression, State Farm believes oral argument will assist the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ........................................... i

STATEMENT REGARDING ORAL ARGUMENT ......................................... v

TABLE OF CITATIONS ............................................................................ viii

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................ 6

STATEMENT OF THE ISSUES PRESENTED ................................................ 8

STATEMENT OF THE CASE ...................................................................... 9

    A.    The Health Care Clinic Act ........................................................ 10

    B.    The LaRocca Clinics ................................................................. 15

    C.    The District Court Proceedings ................................................. 17

    D.    Standard of Review................................................................... 22

SUMMARY OF THE ARGUMENT ............................................................. 22

ARGUMENT .......................................................................................... 26

I.    The text, structure, and purpose of the Clinic Act confirm the wholly owned exemption imposes a duty on owners for their clinics' substantial compliance with federal and state law. ............... 26

    A.    The Clinic Act's plain text mandates that owners operating under the exemption assume a duty to take charge of their clinics' substantial compliance with federal and state law. ....... 27

          1.    The wholly owned exemption's compliance requirement is written in positive terms. ........................ 27

          2.    Reading the statute to create an affirmative duty is also consistent with the legislature's use of the phrase "legal responsibility" in a related provision of the same statute................................................................................. 30

    B.    State Farm's interpretation of the wholly owned exemption's compliance requirement is the only reading that effectuates the Clinic Act's purpose........................................................... 33

    C.    The District Court failed to give meaning or effect to the full language of the wholly owned exemption and the Clinic Act... 37

1. The District Court's concerns about absurd results are mistaken. ......................................................................... 38

2. The District Court erred in selectively ignoring portions of the wholly owned exemption's plain language. ......................................................................... 42

3. The District Court's claim—that the Agency for Health Care Administration must revoke an entity's exemption—is directly contradicted by the statute and the Agency's own rules. ................................................. 47

II. State Farm is entitled to partial summary judgment or, at a minimum, a trial on the Clinic Act theory. ...............................51

A. Because there is no reasonable dispute LaRocca was violating the Anti-Kickback Statute and Patient Brokering Act, no reasonable juror could conclude he satisfied his responsibility for his clinics' compliance with state law. .......... 52

B. At a minimum, State Farm should have been permitted to present its Clinic Act theory to a jury. ...................................... 58

CONCLUSION ............................................................................ 60

CERTIFICATE OF COMPLIANCE ................................................. 61

CERTIFICATE OF SERVICE ....................................................... 62

# TABLE OF CITATIONS

## Cases

*Allstate Ins. Co. v. Vizcay*,
  826 F.3d 1326 (11th Cir. 2016) ............................24, 33, 39, 40, 48, 49, 59

*Allstate Ins. Co. v. Vizcay*,
  No. 11-cv-804, 2014 WL 12619913 (M.D. Fla. Apr. 24, 2014) ............... 44

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................. 58

*Borden v. East-European Ins. Co.*,
  921 So.2d 587 (Fla. 2006) ........................................................ 34

*Circa Ltd. v. City of Miami*,
  79 F.3d 1057 (11th Cir. 1996) .................................................. 22

*Cox Enters., Inc. v. Pension Ben. Guar. Corp.*,
  666 F.3d 697 (11th Cir. 2012) .................................................. 34

*Curves, LLC v. Spalding County*,
  685 F.3d 1284 (11th Cir. 2012) ................................................ 22

*Freyre v. Chronister*,
  910 F.3d 1371 (11th Cir. 2018) .................................................. 7

*Geico v. Mas*,
  No. 19-cv-21183, 2020 WL 9604436 (S.D. Fla. Mar. 31, 2020) ............ 36

*Golf Channel v. Jenkins*,
  752 So.2d 561 (Fla. 2000) ........................................................ 34

*Gov't Empls. Ins. Co. v. Quality Diagnostic Health Care, Inc.*,
  369 F. Supp. 3d 1292 (S.D. Fla. 2019) ....................................... 48

*Heart of Adoptions, Inc. v. J.A.*,
  963 So.2d 189 (Fla. 2007) ........................................................ 43

*Miami Dolphins, Ltd. v. Metro. Dade County*,
  394 So.2d 981 (Fla. 1981) ........................................................ 35

*Polite v. State,*
    973 So.2d 1107 (Fla. 2007) ....................................................... 37

*Starling v. R.J. Reynolds Tobacco Co.,*
    845 F. Supp. 2d 1215 (M.D. Fla. 2011) ................................... 34

*State Farm Fire & Cas. Co. v. Silver Star Health & Rehab,*
    739 F.3d 579 (11th Cir. 2013) ............................................ 11, 59

*State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.,*
    145 F. Supp. 3d 1154 (S.D. Fla. 2015) ..................................... 36

*State Farm Mut. Auto. Ins. Co. v. Fakhoury Med. &
    Chiropractic Ctr.,*
    No. 23-cv-153, 2023 WL 5162293 (M.D. Fla. Aug. 11, 2023) ................ 30

*State Farm Mut. Auto. Ins. Co. v. Filenger,*
    362 F. Supp. 3d 1246 (S.D. Fla. 2018) ..................................... 45

*State Farm Mut. Auto. Ins. Co. v. First Care Sol., Inc.,*
    232 F. Supp. 3d 1257 (S.D. Fla. 2017) ................................. 48, 57

*State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.,*
    103 F. Supp. 3d 1343 (S.D. Fla. 2015) ..................................... 44

*State Farm Mut. Auto. Ins. Co. v. Miami Med. Care Ctr., Inc.,*
    No. 15-cv-22660, 2016 WL 6962872 (S.D. Fla. Nov. 29, 2016) ............. 44

*State Farm Mut. Auto. Ins. Co. v. Performance Orthopedics &
    Neurosurgery, LLC,*
    315 F. Supp. 3d 1291 (S.D. Fla. 2018) ............................43, 48, 60

*State Farm Mut. Auto. Ins. Co. v. Performance Orthopedics &
    Neurosurgery, LLC,*
    No. 17-cv-20028, 2018 WL 2186496 (S.D. Fla. Feb. 16, 2018) ............. 29

*United States v. Pauler,*
    857 F.3d 1073 (10th Cir. 2017) ............................................ 47

*United States ex rel. Bergman v. Abbot Labs.,*
    995 F. Supp. 2d 357 (E.D. Pa. 2014) ...................................... 54

*Urquiola v. Linen Supermarket, Inc.*,
No. 94-cv-14, 1995 WL 266582 (M.D. Fla. Mar. 23, 1995) ..................... 54

*White v. Mercury Marine*,
129 F.3d 1428 (11th Cir. 1997) ................................................. 30

*Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*,
No. 19-cv-62078, 2022 WL 320952 (S.D. Fla. Jan. 29, 2022) .............. 53

## Federal Statutes

28 U.S.C. § 1291 ......................................................................... 8

28 U.S.C. § 1332(a) ...................................................................... 7

42 U.S.C. § 1320a-7b .................................................................. 54

## State Statutes

Fla. Stat. § 400.809 .................................................................. 32

Fla. Stat. § 400.809(4)(*l*) .......................................................... 32

Fla. Stat. § 400.990(2) .......................................................... 11, 34

Fla. Stat. § 400.991(1)(a) ...................................................... 11-12

Fla. Stat. § 400.991(3) ......................................................... 12, 32

Fla. Stat. § 400.991(4)(b) ..................................................... 12, 32

Fla. Stat. § 400.995............................................................... 14, 49

Fla. Stat. § 400.9905(4) ........................................................ 13, 46

Fla. Stat. § 400.9905(4)(g)........................... 1, 3, 9, 13, 22, 26, 27, 42

Fla. Stat. § 400.9925(1) .............................................................. 14

Fla. Stat. § 400.9935(1) ...................................................... 12-13, 31

Fla. Stat. § 400.9935(1)(d) .......................................................... 13

Fla. Stat. § 400.9935(1)(f) .................................................... 13, 31

Fla. Stat. § 400.9935(1)(g) .................................................................31, 39

Fla. Stat. § 400.9935(3)................................... 8, 14, 15, 23, 26, 35, 46, 48-49

Fla. Stat. § 400.9935(4)(a) ............................................................ 35

Fla. Stat. § 400.9935(4)(d)........................................................14, 15, 51

Fla. Stat. § 435.04 ...............................................................................12

Fla. Stat. § 456.054(1) ......................................................................53, 57

Fla. Stat. § 456.054(2) .................................................................15, 41, 53, 57

Fla. Stat. § 456.054(4) ........................................................................ 53

Fla. Stat. § 501.201 *et seq.* .............................................................17

Fla. Stat. § 627.732(11) .................................................................... 36

Fla. Stat. § 627.736(5)(b)(1)(B) .........................................8, 14, 23, 36, 57

Fla. Stat. § 627.736(17) ................................................................... 36

Fla. Stat. § 817.505(1)(a) ...........................................................15, 41, 53, 57

## State Regulations

Fla. Admin. Code R. 59A-33.006 .................................................13

Fla. Admin. Code R. 59A-33.006(1)............................................. 32

Fla. Admin. Code R. 59A-33.006(2) ........................................... 49

Fla. Admin. Code R. 59A-33.006(14)........................................... 50

Fla. Admin. Code R. 59A-33.012................................................12

## Dictionaries

Black's Law Dictionary (11th ed. 2019) .......................................... 28

Oxford English Dictionary (2d ed.)............................................. 28

Merriam-Webster.com Dictionary ............................................. 28

**Other Authorities**

Fla. Stat. Analysis, S.B. 32/A (Mar. 15, 2003) ............................................... 11

OIG Compliance Program Guidance for Pharm. Mfrs.,
    68 Fed. Reg. 23,731 (May 5, 2003) ........................................................ 54

Second Interim Report of the Fifteenth Statewide Grand Jury:
    Report on Insurance Fraud Related to Personal Injury
    Protection, Case No. 95,746 (2000) ............................................ 10, 11, 58

## INTRODUCTION

Florida's Health Care Clinic Act ("Clinic Act" or "Act") was enacted to protect patients and combat insurance fraud by strengthening the regulation and oversight of health care clinics operating in the State. To that end, the Clinic Act requires every entity providing health care services to be licensed as a clinic by the Agency for Health Care Administration ("Agency") unless it qualifies for one of the Act's narrow exemptions.

One such exemption is the wholly owned exemption. Under it, a health care entity may operate without a license if the entity is wholly owned by one or more licensed health care practitioners, but only "if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws." Fla. Stat. § 400.9905(4)(g).

The Florida legislature provided substantial penalties for violations of the Clinic Act. In addition to establishing criminal penalties for any person who knowingly violates various requirements of the statute, the Clinic Act deems "unlawful" and "noncompensable" all charges of a "clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation" of the Act. *Id.* § 400.9935(3). This parallels a provision of Florida's Personal Injury Protection Statute ("PIP Statute"),

1

which the legislature amended simultaneously to provide neither an insurer nor an insured is required to pay a charge that was not lawful when the service was rendered. *Id.* § 627.736(5)(b)(1)(B).

This case involves a scheme by Michael LaRocca, a licensed chiropractor, and twelve of the chiropractic clinics he owns (the "LaRocca Clinics") to collect millions of dollars from State Farm Mutual Automobile Insurance Co. and State Farm Fire and Casualty Co. (together, "State Farm") knowing the medical services his clinics provided were not lawfully rendered or otherwise reimbursable. For at least five years, LaRocca knowingly and repeatedly paid kickbacks to induce or reward patient referrals—to the tune of over $850,000. LaRocca viewed payments and gifts to referral sources as a "thank you" for steering patients to his clinics—a clear violation of Florida's Anti-Kickback Statute and Patient Brokering Act, which protect patients and insurers by ensuring medical providers are making treatment decisions free from the influence of pecuniary reward.

Because LaRocca and his clinics failed to comply with these important state laws, his clinics violated a key requirement of the Clinic Act: LaRocca failed in his duty, under the wholly owned exemption, to be "legally responsible for" his clinics' compliance with the Anti-Kickback Statute and Patient Brokering Act. State Farm moved for partial summary judgment or

in the alternative a trial on this issue, contending that, by failing to satisfy the wholly owned exemption, the clinics' charges submitted to State Farm were (and are) unlawful and noncompensable.

The District Court disagreed. Although it recognized the wholly owned exemption requires a licensed health care provider to wholly own the entity, the court failed to give effect to the portion of the exemption requiring an owner to be "legally responsible for the entity's compliance with all federal and state laws." The District Court did so on the theory that this language would lead to absurd results—requiring an owner to assume responsibility for an entity's "perfect compliance" with every federal and state law. The court also opined the Agency must affirmatively revoke any applicable exemption before charges are rendered noncompensable.

The District Court's decision was wrong for at least three reasons:

*First*, it gave no meaning to a key requirement of the Clinic Act's wholly owned exemption—that an owner must be "*legally responsible* for the entity's compliance with all federal and state laws." Fla. Stat. § 400.9905(4)(g) (emphasis added). Drawing on prevailing definitions of "responsible," the exemption imposes on owners a "duty to be in charge" of their clinic's compliance with federal and state law. *Responsible*, Black's Law Dictionary (11th ed. 2019); *accord Responsible*, Oxford English Dictionary

(2d ed.), http://tinyurl.com/4zdptdar. To satisfy that duty, an owner must at least make a good-faith effort on behalf of his entity to comply with federal and state law—though he need not necessarily achieve perfect compliance with every law under the sun. As this Court explained in addressing an analogous duty under the Clinic Act, achieving "substantial compliance" is enough. *Allstate Ins. Co. v. Vizcay*, 826 F.3d 1326, 1331 (11th Cir. 2016). On the flip side, an owner whose clinic is *not* in substantial compliance with federal or state law—particularly laws aimed at protecting patients like the Anti-Kickback Statute and the Patient Brokering Act—fails to satisfy his or her duty under the exemption.

*Second*, the District Court's conclusion is impossible to reconcile with the legislative intent of the Clinic Act. It is absurd to think the legislature intended to allow entities taking advantage of the Clinic Act's exemption to systematically violate state laws designed to protect patients, yet still permit those entities to collect charges for services rendered. Indeed, in this very case, LaRocca and his clinics have so far escaped any consequence for their continuous and systematic violations of the Anti-Kickback Statute and Patient Brokering Act.

*Third*, the District Court's purported rationales for rejecting State Farm's construction do not withstand scrutiny. As noted above, imposing a

4

duty on owners to be "legally responsible for" their entities' compliance with the law does not require those entities to achieve "perfect compliance." To the contrary, an owner who undertakes a good-faith effort at the entity's compliance—by, for example, achieving "substantial compliance" with federal and state law—has satisfied the legal duty imposed by the wholly owned exemption. In contrast, an owner who engages in a pervasive kickback scheme—like LaRocca did here—cannot invoke the exemption. There is nothing absurd about this result.

Nor is there any basis on which to distinguish, as the District Court did, between responsibility for compliance and the various other requirements of the wholly owned exemption. In the District Court's view, only the failure to satisfy the first clause of the exemption—that an entity be "wholly owned" by a licensed health care practitioner—is automatically enforceable. The remaining clauses, including an owner's legal responsibility for a clinic's compliance with federal and state law, have no apparent effect. But as courts had uniformly recognized—at least until the decision below—an entity operating under the wholly owned exemption must satisfy *all* the exemption's requirements or the entity's charges are unlawful and noncompensable.

Lastly, there is no support for the District Court's belief the Agency for Health Care Administration must affirmatively revoke an entity's exemption before the entity's charges are rendered unlawful. The Clinic Act and the Agency's own rules say the opposite: no action on the Agency's part is required to render unlawful and noncompensable the charges of a health care clinic that fails to meet the requirements of an exemption.

Accordingly, the District Court's failure to enforce the plain language of the Clinic Act was error. And because the undisputed evidence shows LaRocca carried out, and the defendant LaRocca Clinics engaged in, a continuous and intentional kickback scheme to induce and reward patient referrals, State Farm was entitled to partial summary judgment on the Clinic Act theory. At a minimum, State Farm was entitled to present to a jury its theory that LaRocca's payments violated the Anti-Kickback Statute and Patient Brokering Act, and that, by doing so, he failed in his legal responsibility for his clinics' compliance with those statutes, rendering his clinics' charges unlawful and noncompensable.

## JURISDICTIONAL STATEMENT

State Farm brought claims against LaRocca, his clinics, and other affiliated medical providers for fraud, unjust enrichment, civil conspiracy, and violations of the Florida Deceptive and Unfair Trade Practices Act for

6

submitting insurance claims for treating State Farm insureds that were fraudulent and otherwise non-reimbursable. The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, the State Farm entities are citizens of Illinois, and the defendants are citizens of Florida.

State Farm presented two distinct theories of liability in support of its various causes of action—one under the Clinic Act and the other based on a lack of medical necessity for services rendered by the defendants. Before trial, the District Court denied State Farm's motion for partial summary judgment on the Clinic Act theory and subsequently denied reconsideration. *See* Dkt.361, 420. As part of its ruling on reconsideration, the court held State Farm could not present the Clinic Act theory to the jury, effectively directing judgment as a matter of law in favor of the defendants on this theory. Dkt.420 at 10.

Thereafter, the jury rendered a verdict for defendants on State Farm's medical necessity theory, and the District Court entered a final judgment on November 8, 2023. Dkt.488. As a result, the District Court's prior orders merged with the final judgment. *Freyre v. Chronister*, 910 F.3d 1371, 1378 (11th Cir. 2018) ("Earlier interlocutory orders merge into the final judgment,

and a party may appeal the latter to assert error in the earlier interlocutory order." (citation omitted)).

State Farm timely filed a notice of appeal on December 6, 2023. Dkt.499. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED

Under Florida's Health Care Clinic Act an entity operating as a health care clinic must obtain a license or satisfy an exemption from licensure. Notably, under the Clinic Act and PIP Statute charges are unlawful, noncompensable, and unenforceable if they are submitted by a clinic that does not qualify for an exemption, is operating without a license, or is otherwise operating in violation of the law. Fla. Stat. § 400.9935(3); *id.* § 627.736(5)(b)(1)(b).

The issues presented here are:

1. Whether, to satisfy the wholly owned exemption of the Clinic Act, which specifies an owner must be "legally responsible for the entity's compliance with all federal and state laws," the owner assumes a legal duty for the entity's substantial compliance with federal and state laws?

2. Whether State Farm was entitled to summary judgment, or at a minimum a trial, on its claims the defendant clinics' charges are unlawful and noncompensable where there was undisputed evidence LaRocca

intentionally and continuously paid kickbacks to induce and reward patient referrals and thus failed to be legally responsible for his clinics' compliance with Florida's Anti-Kickback Statute and Patient Brokering Act?

## STATEMENT OF THE CASE

Michael LaRocca operated twelve chiropractic clinics without a license under Florida's Health Care Clinic Act. To avoid the Clinic Act's licensure requirements, he operated his entities as if they qualified under the Act's wholly owned exemption, which required him, among other things, to be "legally responsible for the entit[ies'] compliance with all federal and state laws." Fla. Stat. § 400.9905(4)(g).

While claiming the exemption, over at least a five-year period, LaRocca was personally responsible for the payment of over $850,000 in kickbacks to personal injury attorneys and others to induce and reward patient referrals, in violation of Florida's Anti-Kickback Statute and Patient Brokering Act. Indeed, as explained below, the evidence of LaRocca's kickback scheme was overwhelming and largely undisputed.

As a result, State Farm asserted LaRocca violated his legal duty under the wholly owned exemption to assume responsibility for his clinics' compliance with federal and state laws—specifically, Florida's Anti-Kickback Statute and Patient Brokering Act. And LaRocca's failure to satisfy the

exemption rendered any charges submitted by the LaRocca Clinics unlawful and noncompensable under explicit provisions of the Clinic Act and the PIP Statute.

Although the District Court recognized this Clinic Act theory presented a "serious legal question of first impression," it denied State Farm's motion for partial summary judgment and prohibited State Farm from advancing this theory at trial. State Farm challenges those decisions here.

## A.    The Health Care Clinic Act

Since the late 1990's, the Florida legislature has been concerned about escalating costs for the state's no-fault insurance system attributable to fraud.

In 2000, a statewide grand jury issued a report finding fraud directed at personal injury protection insurance ("PIP insurance") was rampant. *See* Second Interim Report of the Fifteenth Statewide Grand Jury: Report on Insurance Fraud Related to Personal Injury Protection, Case No. 95,746 (2000) ("2000 Grand Jury Report"). Among several issues identified by the grand jury, one of the most concerning was the "brokering [of] patients between doctors, lawyers and diagnostic facilities, as well as the attendant fraud, which can include the filing of false claims." *Id.* at 1. The grand jury found "greedy and unscrupulous legal and medical professionals" turned the

minimum required PIP insurance "into their personal slush fund" by "paying kickbacks for patients." *Id.* at 2. It also found laws prohibiting such conduct "have been ineffective in providing strong enough consequences." *Id.* at 2-3.

To combat this pervasive fraud, the grand jury recommended the legislature "[r]equire the regulation and licensing of all medical facilities" and amend the law to "state that no insurer or auto accident victim is obligated to pay for any services rendered by any medical provider or attorney who has solicited the victim or caused the victim to be solicited contrary to Florida Statutes." *Id.* at 12-13. The grand jury also recommend the law provide that "[a]ny such billings for such services are rendered null and void and unenforceable as a matter of law." *Id.* at 13.

Against this backdrop, the Florida legislature enacted the Clinic Act "to provide for the licensure, establishment and enforcement of basic standards for health care clinics and to provide administrative oversight by the [Florida] Agency for Health Care Administration." Fla. Stat. § 400.990(2) (emphasis added); *see also* Fla. Stat. Analysis, S.B. 32/A, § 4 (Mar. 15, 2003).

As amended over time, the Clinic Act requires clinics to be licensed by the Agency. Fla. Stat. § 400.991; *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 582 (11th Cir. 2013). To be licensed, a clinic must apply to the Agency and agree to be subject to the Agency's oversight.

Fla. Stat. § 400.991(1)(a). Further, all individuals who own or otherwise control at least 5 percent or more of an interest in the clinic must submit to a "level 2 background screening." *Id.* § 400.991(4)(b). That screening involves submitting fingerprints and agreeing to security background checks through the state Department of Law Enforcement and national criminal history checks through the Federal Bureau of Investigation. *Id.* § 435.04.

The applicant must also include with its application "satisfactory proof that the clinic is in compliance with" the Clinic Act and all applicable rules, including (1) identifying all services to be provided; (2) the number and discipline of each staff member; and (3) proof of financial ability to operate. *Id.* § 400.991(3). Licensed clinics are also subject to inspection by the Agency when seeking a license, at the time of license renewal, or in the event of any complaints. Fla. Admin. Code R. 59A-33.012.

Notably, a licensed clinic also must appoint a medical director or clinic director who must "agree in writing to accept legal responsibility" for certain enumerated activities on behalf of the clinic. Fla. Stat. § 400.9935(1). Those activities include, among other things, "[e]nsuring that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided" and "[e]nsur[ing] compliance with"

certain "recordkeeping, office surgery, and adverse incident reporting requirements." *Id.* § 400.9935(1)(d), (f).

If a health care practitioner wants to avoid these hurdles, he or she can choose to operate as an "entity" under one of the Clinic Act's exemptions. The Act accomplishes this through its definition section, which distinguishes between a licensed "clinic" and an exempt "entity." *Id.* § 400.9905(4). An entity that satisfies one of the exemptions set forth in section 400.9905(4) is not considered a "clinic" and the "licensure requirements of [the Clinic Act] do not apply." *Id.*

As relevant here, one of those exemptions is the wholly owned exemption. Under it, a health care facility is exempt from licensure if it is wholly owned by one or more licensed health care practitioners but only if the provider-owner "is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws." *Id.* § 400.9905(4)(g).

An entity operating pursuant to an exemption is not required to apply for the exemption or otherwise notify the Agency of its operations—though such an entity may voluntarily seek a certificate of exemption. Fla. Admin. Code R. 59A-33.006. As such, an individual may self-determine whether the facility he or she wishes to operate qualifies for one of the exemptions and

then operate an unlicensed entity consistent with those exemptions. *Id.* Even those individuals who apply for a certificate of exemption are allowed to simply check a box on the application identifying the exemption under which their entity is operating. *E.g.*, Dkt.256-4 at 5.[1]

To enforce the Clinic Act's requirements, the legislature established four mechanisms. First, the legislature declared a charge for payment from a clinic or entity "that is operating in violation of [the Clinic Act's requirements] . . . is an unlawful charge and is noncompensable and unenforceable." Fla. Stat. § 400.9935(3). And it included a similar provision in the PIP Statute. *Id.* § 627.736(5)(b)(1)(b) (providing that neither an insured nor insurer is obligated to pay a charge "for any service that was not lawful at the time it was rendered"). Second, the legislature provided the Agency for Health Care Administration authority to "adopt rules necessary to administer the clinic administration, regulation and licensing program," as well as authority to bring enforcement actions and assess fines and penalties for violations of the Act. *Id.* §§ 400.9925(1), 400.995. Third, the legislature imposed a duty on "a health care provider who is aware of the

---

[1] Citations to "Dkt.XXX" refer to the docket number in the district court. Page references refer to the page number in the header generated by the district court's electronic filing system, if available, or a Bates number, if an ECF header is not available. Page references for transcripts use the page number assigned by the court reporter.

operation of an unlicensed clinic" to "report the clinic" to the Agency. *Id.* § 400.9935(4)(d). Finally, the legislature provided a person who knowingly violates various requirements of the Act may be held criminally liable. *Id.* § 400.9935(3), (4).

## B.    The LaRocca Clinics

Michael LaRocca is a licensed chiropractor. He has owned and operated the twelve LaRocca Clinics since at least 2017. Dkt.256-2 at 147; Dkt.256-3 at 87-88.

The LaRocca Clinics have never been licensed under the Clinic Act. Instead, LaRocca has operated his entities under the wholly owned exemption. From 2017 to 2019, LaRocca self-determined his clinics qualified for the exemption. In August 2019, he applied for a certificate of exemption from the Agency. Dkt.256-4. In that application, LaRocca attested he supervises the business activities of the LaRocca Clinics, including marketing, and assumed responsibility for the entities' compliance with all federal and state laws. *E.g.*, Dkt.256-4 at 7, 13, 19. Nevertheless, for at least five years, LaRocca intentionally and continuously violated his legal responsibility to operate the LaRocca Clinics in compliance with two significant state laws—the Anti-Kickback Statute and the Patient Brokering Act. Those statutes make it unlawful to offer any sort of remuneration with

the intent of inducing or rewarding patient referrals. Fla. Stat. §§ 456.054(2), 817.505(1)(a).

Among other things, the undisputed facts show the LaRocca Clinics employed over 30 "marketers" who ultimately answered to LaRocca. Dkt.257-2, Dkt.257-3. The marketers' job was to get new patients for the LaRocca Clinics. Dkt.256-2 at 270; Dkt.256-13 at 121.

From January 1, 2017, through the date of trial, LaRocca paid more than $3 million to those "marketers" to develop relationships with patient referral sources consisting of personal injury lawyers and primary care providers who do not treat auto accident patients. Dkt.257 at 2. He evaluated those marketers' performance based on the number of referrals generated from their respective geographic areas. Dkt.256-2 at 162; Dkt.256-13 at 121, Dkt.256-14 at 223-24.

Although he knew it was illegal to provide anything of value to encourage or reward a referral, LaRocca gave the marketers dedicated credit cards to buy gifts for referral sources. Dkt.265-2 at 196-97, 199, 230; Dkt.256-12 at 46-47, 65-66. And he reviewed the monthly statements for those cards before paying them to confirm the expenses were for things of value to be provided to potential referral sources. Dkt.265-2 at 197.

From 2017 through 2021, the marketers incurred more than $850,000 in purchases on these credit cards, virtually all of which were intended to reward referral sources. Dkt.257 at 11. These kickbacks included an average of almost $15,000 per month in free meals and drinks, as well as at least $35,000 in sporting and concert tickets, $25,000 in spa and beauty purchases, and $ 12,000 in clothes, and on at least two occasions, purchasing $1,000 cruise tickets for referral sources. *See* Dkt.257-5 to Dkt.257-9. LaRocca admitted the payments at issue were a "thank you" for sources "trusting the [LaRocca] Clinics" by sending patients. Dkt. 265-2 at 201.

Significantly, these violations were ongoing at the time LaRocca submitted his applications for certificates of exemption. Thus, the attestation LaRocca submitted, stating he has not "knowingly made a false statement with the intent to mislead the Agency in the performance of its official duty," was false and misleading at the time he made it, violating provisions of the Clinic Act and section 837.06 of the Florida Statutes. *See* Dkt.256-4.

## C.    The District Court Proceedings

State Farm sued LaRocca and the LaRocca Clinics to recover $2.7 million paid to the LaRocca Clinics for the treatment of people insured by State Farm before the complaint was filed. State Farm asserted common law claims for fraud, civil conspiracy, and unjust enrichment, as well as a

17

statutory claim under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA"). State Farm also sought a declaratory judgment it is not liable for any unpaid charges the LaRocca Clinics submitted or caused to be submitted—charges that, today, total $1.5 million. Dkt.161 at 6-7.

In support of its position, State Farm asserted two theories: the "medical necessity theory," and the "Clinic Act theory." This appeal concerns only the Clinic Act theory.

Under the Clinic Act theory, State Farm alleged the LaRocca Clinics had been operating in violation of the wholly owned exemption for at least five years due to LaRocca's failure to satisfy his duty to be legally responsible for his clinics' compliance with the law. There was no dispute LaRocca wholly owned the LaRocca Clinics. Instead, State Farm asserted LaRocca's scheme to build his clinics' business by providing kickbacks to reward and induce patient referrals violated his obligation to operate the LaRocca Clinics in compliance with two relevant laws: the Florida Anti-Kickback Statute and Patient Brokering Act. Accordingly, State Farm maintained the LaRocca Clinics were operating in violation of the Clinic Act and without a license, rendering all their charges for treatment unlawful and noncompensable.

18

Before trial, State Farm moved for partial summary judgment on the FDUPTA and unjust enrichment claims, as well as on the request for declaratory relief, based on the Clinic Act theory. Dkt.257. The defendants did not cross-move.

The District Court denied State Farm's motion. Dkt.361 at 14. It rejected State Farm's arguments concerning the wholly owned exemption for three reasons: (1) State Farm's "fail[ure] to cite any authority directly on point in support of its interpretation of the licensing statute"; (2) concern that State Farm's proposed interpretation would lead to "absurd results if the expectation was perfect compliance"; and (3) even if perfect compliance was not required, the court was unclear about where the line should be drawn. *Id.* at 11-14. Notably, however, the court never gave any meaning or effect to the legislature's requirement that the owner of an entity operating under the wholly owned exemption must be "legally responsible for compliance with all federal and state laws."

State Farm moved for reconsideration, asserting it was a clear error of law to hold LaRocca's conduct did not violate his obligation to be legally responsible for the LaRocca Clinics' compliance with federal and state laws. Dkt.372. It also sought clarification about whether it could present the Clinic Act theory to the jury, arguing that, at a minimum, a question of fact existed

19

as to whether LaRocca substantially complied with his obligations under the wholly owned exemption. Dkt.372 at 16.

The District Court held a pre-trial conference in September 2023, during which it explained it was going to deny State Farm's motion for reconsideration but expressed some doubt about how the case should proceed at trial regarding the Clinic Act theory. Dkt.522.

To assist the court, State Farm filed a proposal for proceeding with the theory at trial. Dkt.393. In that proposal, State Farm identified at least three cases in which courts left to a jury the question of whether an owner of an entity operating under the wholly owned exemption satisfied the requirements of the exemption—though none directly addressed the "legally responsible" requirement. Dkt.393 at 3-7.

The District Court rejected State Farm's arguments. Dkt.420. The court concluded the Clinic Act "does not require the owner/licensed health care practitioner to ensure compliance with all federal and state laws in the manner suggested by Plaintiffs." Dkt.420 at 6, 10. In addition, the court believed, because the wholly owned exemption is found in the "Definitions" section of the Clinic Act, the Agency must affirmatively revoke a clinic's exemption before the clinic's charges may be deemed unlawful and noncompensable. Dkt.420 at 6.

The District Court similarly rejected State Farm's proposal for presenting the Clinic Act theory at trial. In the court's view, "Plaintiffs' theory of liability [under the Clinic Act] . . . fails as a matter of law, and there is no question of fact for the jury to decide as to whether Michael LaRocca's conduct violated his legal responsibility for the Clinics' compliance with all federal and state laws." Dkt.420 at 10. Thus, even though the defendants never cross-moved for judgment on this issue, the District Court granted them such relief *sua sponte.*

Accordingly, State Farm was limited at trial to its theory of a lack of medical necessity. The jury returned a verdict for the defendants on all claims under this theory.

After trial, State Farm moved to stay enforcement of the judgment and LaRocca's motion for attorneys' fees pending resolution of the appeal. Although no money judgment was awarded against State Farm, it offered to voluntarily post a $1.7 million supersedeas bond to maintain the status quo pending appeal by keeping in place the conditions supporting stays of a series of state-court actions where the defendants sought to collect on their unpaid claims.

The District Court granted State Farm's motion for a stay, emphasizing this appeal "presents a serious legal question of first impression and a

concomitant possibility of success on the merits." Dkt.524 at 4. The court recognized it precluded State Farm from advancing this theory of liability to the jury and if State Farm were successful in its appeal, it "may be either afforded the right to re-try the case on [its] licensing theory of liability or be entitled to summary judgment on this theory . . . potentially obviat[ing] the jury's verdict entirely." *Id.*

This appeal followed.

### D.    Standard of Review

This Court reviews *de novo* the denial of a motion for summary judgment and issues of statutory interpretation. *Curves, LLC v. Spalding County*, 685 F.3d 1284, 1288 (11th Cir. 2012). Although this Court ordinarily reviews for an abuse of discretion the denial of a motion for reconsideration, it reviews *de novo* an order directing judgment as a matter of law for a particular party. *Circa Ltd. v. City of Miami*, 79 F.3d 1057, 1063 (11th Cir. 1996).

### SUMMARY OF THE ARGUMENT

An owner of an entity operating under the wholly owned exemption must satisfy three requirements: (1) be a licensed health care practitioner; (2) supervise the business activities of the entity; and (3) be legally responsible for the entity's compliance with federal and state law. Fla. Stat.

§ 400.9905(4)(g). The Clinic Act and PIP Statute are equally clear: charges submitted by an entity operating in violation of the Act or otherwise in violation of the law are noncompensable and unenforceable. *Id.* §§ 400.9935(3); 627.736(5)(b)(1)(b).

The District Court nevertheless refused to enforce the third requirement of the wholly owned exemption—that an owner be legally responsible for the entity's compliance with federal and state law—despite being presented with overwhelming and undisputed evidence that over a period of at least five years, LaRocca intentionally and continuously paid kickbacks to induce and reward patient referrals, violating Florida's Anti-Kickback Statute and Patient Brokering Act. That was error.

As a threshold matter, the Clinic Act's text, structure, and purpose demonstrate the wholly owned exemption's compliance requirement imposes a duty on owners to take charge of the entity's compliance with federal and state law—particularly those laws aimed at protecting patients, preventing insurance fraud, and promoting fair competition in health care markets. For one thing, the language of the exemption's compliance requirement is written in positive terms: Under prevailing dictionary definitions, being "legally responsible for the entity's compliance" means taking on a duty or being in charge of the entity's compliance.

23

The legislative intent underlying the Clinic Act reinforces this plain-language reading. The legislature enacted the Act to strengthen regulation of clinics and protect the public from unscrupulous individuals. The legislature achieved those purposes, in part, by deeming charges unlawful and noncompensable if submitted by clinics or entities operating in violation of the Act. It would undermine the legislature's intent to allow entities operating under the wholly owned exemption to flout that exemption's requirements by systematically violating state laws like the Anti-Kickback Statute and Patient Brokering Act, but nonetheless recoup millions of dollars in payments for services rendered in violation of those laws.

The District Court's rationales for rejecting State Farm's interpretation of the Clinic Act do not call into question this result.

*First*, State Farm's proposed construction does not require "perfect compliance" with every law, nor does it lead to "absurd results." As this Court explained in *Vizcay*, whatever line-drawing problem may exist in the abstract, evidence a clinic failed to "substantially comply" with a requirement of the Act is sufficient to render the clinic's charges noncompensable. 826 F.3d at 1332. The same rationale applies here. Under a proper reading of the wholly owned exemption, an owner who directs his clinic to systematically violate the law forfeits the right of his business to get paid.

*Second*, there was no basis for the District Court's claimed distinction between the first clause of the wholly owned exemption—requiring that an entity be wholly owned by a licensed health care practitioner—and the second and third clauses. Although no court has directly addressed the wholly owned exemption's compliance requirement, *every* court that has considered the exemption held an entity's failure to meet *all* the requirements is operating in violation of the Clinic Act and its charges are noncompensable. And that makes sense: courts are required to interpret the language of a statute to give full effect to *all* its provisions, not some of them.

*Lastly*, there is no support for the District Court's suggestion that the Agency for Health Care Administration must formally revoke an entity's exemption before the entity's charges are noncompensable. Both the Clinic Act and the Agency's own rules provide when a change occurs that negates an entity's qualification for an exemption, the entity is deemed a clinic and must apply for a license. And because the entity "is operating in violation of the law," its charges are rendered noncompensable and unenforceable.

Thus, the wholly owned exemption mandates that an owner assumes a duty for the clinic's compliance with federal and state laws—and, at a minimum, fidelity to that duty requires the clinic to substantially comply with the Anti-Kickback Statute and the Patient Brokering Act. Because State

Farm presented undisputed evidence of LaRocca's continuous and intentional kickback scheme to induce and reward patient referrals, State Farm showed LaRocca failed in his duty, rendering his clinics' claims noncompensable. As a result, State Farm was entitled to summary judgment on its FDUTPA and unjust enrichment claims, as well as on its request for a declaratory judgment. At a minimum, State Farm should have been given the opportunity to advance this theory to a jury.

For these reasons, the judgment should be vacated.

## ARGUMENT

### I. The text, structure, and purpose of the Clinic Act confirm the wholly owned exemption imposes a duty on owners for their clinics' substantial compliance with federal and state law.

The Clinic Act provides that owners of entities operating under the wholly owned exemption assume an obligation to be "legally responsible for the [clinic's] compliance with all federal and state laws." Fla. Stat. § 400.9905(4)(g). When owners intentionally violate that obligation, their entities no longer satisfy the exemption; they are not otherwise licensed; and thus, they are operating in violation of the law, rendering all the entity's charges unlawful and noncompensable. *Id*. § 400.9935(3).

The District Court failed to give meaning to the wholly owned exemption's requirement of "legal[] responsibil[ity]" and declined to enforce

26

it. That was error. The statute's plain text and well-established principles of statutory construction confirm the exemption's requirements impose a duty on owners to take charge of their clinics' substantial compliance with federal and state law.

### A. The Clinic Act's plain text mandates that owners operating under the exemption assume a duty to take charge of their clinics' substantial compliance with federal and state law.

#### 1. The wholly owned exemption's compliance requirement is written in positive terms.

The wholly owned exemption's compliance requirement is framed in positive terms—the owner is "legally responsible for the clinic's compliance with all federal and state laws." Fla. Stat. § 400.9905(4)(g). That provision imposes an affirmative duty on an owner for an entity's compliance with the law—otherwise, that entity does not satisfy the exemption and is operating in violation of the Clinic Act.

In understanding the meaning of the wholly owned exemption's compliance requirement, the key is the adverb-adjective phrase "legally responsible," which modifies the noun "compliance." If someone is "legally responsible for compliance" with the law, the most natural reading is that the person assumes an affirmative duty for complying with the law—meaning that person is in charge of the clinic's compliance with the law.

27

That reading is consistent with prevailing dictionary definitions of the key words. The word "responsible" means "accountable for the execution of certain duties" and "having a duty to be in charge of something or to look after something." *Responsible*, Black's Law Dictionary (11th ed. 2019). Indeed, the Oxford English Dictionary explains that when "responsible" is used with "for" it means "[b]eing in charge of something; [being] appointed to look after something." *Responsible*, Oxford English Dictionary (2d ed.), http://tinyurl.com/4zdptdar. And "compliance" is defined as "[t]he state of being in conformity with some command, demand, requirement, etc.," as "brought into compliance with the statute." *Compliance*, Black's Law Dictionary; *accord Compliance*, Oxford English Dictionary (defining "compliance" as "acting in accordance with"), http://tinyurl.com/ymcyhuk9.

Thus, being "legally responsible for the entity's compliance," as used in the wholly owned exemption, means "having a duty to be in charge" of the entity's "conformity with" federal and state law. That interpretation accords meaning to every word of the phrase.

There is an alternative construction of "responsible," but it does not fit contextually. "Responsible" can mean "liable to be called on to answer" or "liable to legal review or in case of fault to penalties." *Responsible*, Merriam-Webster.com Dictionary, http://tinyurl.com/3mfp5mr7. But no reasonable

28

reader would read the phrase "legally responsible . . . for compliance" to mean an owner is "liable" for a clinic's "compliance." For one thing, it mixes positive and negative terms. A person is not "liable" for "compliance"; rather, he is liable for *non*-compliance (*i.e.,* a *violation* of the statute). For another, if the legislature intended to impose some level of passive, post-hoc liability, it could have said so much more directly. For example, it could have said the owner is legally responsible for the clinic's "*failure* to comply with federal or state law" or for "*violations* of federal and state law."

Although no court has directly addressed the wholly owned exemption's requirement of "legal[ ] responsibil[ity] for compliance," district courts have naturally read the language to mean owners benefitting from the exemption have an affirmative duty for an entity's compliance with federal and state law. For instance, in *State Farm v. Performance Orthopedics & Neurosurgery, LLC*, the court explained that "allowing clinics to operate unlicensed merely because they are owned by a practitioner[—]irrespective of whether these practitioners supervised the clinic's business activities or *ensured* compliance with federal and state law—would undermine the purpose of the Clinic Act." No. 17-cv-20028, 2018 WL 2186496, at *9 & n.13 (S.D. Fla. Feb. 16, 2018) (emphasis added); *accord State Farm Mut. Auto. Ins. Co. v. Fakhoury Med. & Chiropractic Ctr.*, No. 23-cv-153, 2023 WL

5162293, at *1 (M.D. Fla. Aug. 11, 2023) ("FMCC is an unlicensed health care clinic under the [Clinic Act] and operates ostensibly under an exemption from licensure when a health care practitioner supervises the clinics business activities and *ensures compliance with all federal and state laws*." (emphasis added)). For all these reasons, the exemption is best understood as imposing a duty on owners to take charge of their clinic's compliance with federal and state laws.

> ## 2. Reading the statute to create an affirmative duty is also consistent with the legislature's use of the phrase "legal responsibility" in a related provision of the same statute.

"It is a familiar canon of statutory construction that courts should generally construe similar statutory language similarly." *White v. Mercury Marine*, 129 F.3d 1428, 1434 (11th Cir. 1997). Thus, where the legislature uses similar terms across separate provisions of a statute, those terms should be given the same meaning. *Id.* Here, interpreting "legally responsible for the entity's compliance" to mean an owner has a duty to take charge of her entity's compliance with the law is also consistent with how the phrase "legal responsibility" is used in other sections of the Clinic Act.

A licensed clinic must appoint a medical or clinical director who must "agree in writing to accept legal responsibility for" various activities of the clinic. Fla. Stat. § 400.9935(1). The Clinic Act then explains what it means to

"accept legal responsibility": It delineates a series of affirmative obligations the director must discharge—like "[e]nsur[ing] compliance with" certain "recordkeeping, office surgery, and adverse incident reporting requirements," *id.* § 400.9935(1)(f), and "conduct[ing] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." *Id.* § 400.9935(1)(g).

Thus, when the legislature used phrases like "legally responsible" and "legal responsibility" it meant a person takes on a duty to assume affirmative responsibility for the obligations of a clinic. And in this case, it means LaRocca assumed a duty to take charge of his clinics' compliance with federal and state laws, including the Anti-Kickback Statute and Patient Brokering Act.

The District Court took issue with the fact that the Clinic Act enumerates the activities for which a medical director is responsible, while State Farm's interpretation of the Act imposes "much broader" responsibility on the owner of an exempt entity. Dkt.420 at 7. But that makes sense.

As discussed above, licensed clinics are subject to extensive oversight by the Agency. Applicants seeking to serve as a medical or clinical director of such clinics are subject to lengthy background checks, Fla. Stat. §§ 400.991(4)(b), 400.809, and are ineligible if they have committed certain

felonies—including patient brokering, *id.* § 400.809(4)(*l*). Moreover, licensed clinics must submit proof to the Agency of compliance with all applicable rules governing health care clinics. *Id.* § 400.991(3).

In contrast, an unlicensed clinic taking advantage of the wholly owned exemption may bypass these requirements and is subject to almost no oversight. Indeed, an individual is entitled to self-determine whether a clinic qualifies for an exemption, without scrutiny from the Agency. *See* Fla. Admin. Code R. 59A-33.006(1) ("An entity is not required to have, but may voluntarily apply for, a certificate of exemption.").

But there is an important trade-off between the State and an entity seeking to avail itself of this exemption from licensure: its owner is required to supervise the entity's business activities and accepts a broader legal duty for the entity's compliance with federal and state laws. Indeed, it is understandable the legislature would impose a broader range of responsibilities on an *owner* of an entity than a medical or clinical director *employee*.

This Court's decision in *Allstate Insurance Co. v. Vizcay* is consistent with this commonsense understanding of the wholly owned exemption. 826 F.3d at 1331. There, the Court interpreted the Clinic Act's language requiring a medical or clinical director to "accept legal responsibility" for certain

activities on behalf of the clinic. *Id.* It held this language required the director to "substantially comply" and "carry[] out the duties enumerated in the statute as the agent of the clinic." *Id.* As a result, this Court affirmed a judgment for Allstate based on the medical director's failure to "substantially comply" with her legal responsibility under the Clinic Act to systematically review the clinic's bills. *Id.* at 1332.

That same rationale resolves this case. To satisfy the exemption, LaRocca had a duty to ensure his clinics were substantially complying with federal and state laws. His systematic violation of Florida's Anti-Kickback Statute and Patient Brokering Act renders the entities' charges unlawful and noncompensable.

### B. State Farm's interpretation of the wholly owned exemption's compliance requirement is the only reading that effectuates the Clinic Act's purpose.

The plain text of the wholly owned exemption resolves this case in State Farm's favor. But even beyond the text, it is impossible to reconcile the purpose of the Clinic Act with a reading of the statute that allows entities and their owners to flout the law with impunity yet still claim entitlement to payment.

It is black-letter law that when interpreting a statute, the legislature's intent is the "polestar" that guides a reviewing court in its analysis. *Borden*

*v. East–European Ins. Co.*, 921 So.2d 587, 595 (Fla. 2006); *accord Cox Enters., Inc. v. Pension Ben. Guar. Corp.*, 666 F.3d 697, 704 (11th Cir. 2012) ("[W]hen interpreting a [Florida] statute, we give effect to the Florida legislature's intent and accord meaning to all parts of the statute."). Moreover, remedial statutes, like the Clinic Act, "should be given a liberal interpretation and should be construed to give the terms used the most extensive meaning to which they are reasonably susceptible" and in "favor of granting access to the remedy provided by the legislature." *Starling v. R.J. Reynolds Tobacco Co.*, 845 F. Supp. 2d 1215, 1232 (M.D. Fla. 2011) (citing *Golf Channel v. Jenkins*, 752 So.2d 561, 566 (Fla. 2000)).

As noted above, the legislature enacted the Clinic Act after finding "the regulation of health care clinics must be strengthened to prevent significant cost and harm to consumers." Fla. Stat. § 400.990(2). The statute, therefore, is intended to protect the public by, among other things, increasing "the regulation of health care clinics . . . to prevent significant cost and harm to consumers." *Id.* To that end, the legislature set up a host of criminal penalties for any person who knowingly violates various requirements of the Act, *id.* § 400.9935(3), (4)(a), and it provided that charges submitted by an entity operating in violation of the Act's requirements are "noncompensable and unenforceable" as a matter of law, *id.* § 400.9935(3).

It would undermine the purpose of the statute to allow owners of entities operating under the wholly owned exemption to systematically violate laws designed to protect patients, reduce health care costs, and promote fair competition, but nonetheless permit their entities to profit from such misconduct. That is particularly true here, where undisputed evidence shows LaRocca was personally responsible for continuously violating the Anti-Kickback Statute and the Patient Brokering Act.

State Farm's reading of the wholly owned exemption's requirements is further bolstered when reading the Clinic Act in *pari materia* with related provisions of Florida's PIP Statute. *See Miami Dolphins, Ltd. v. Metro. Dade County*, 394 So.2d 981, 988 (Fla. 1981) ("[L]aws should be construed with reference to . . . the purpose designed to be accomplished, and in connection with other laws in *pari materia*, though they contain no reference to each other." (citation omitted)). At the time the legislature enacted the Clinic Act, it simultaneously amended the PIP Statute to provide that neither an insured nor an insurer is obligated to pay a charge "for any service that was not lawful at the time it was rendered." Fla. Stat. § 627.736(5)(b)(1)(b).

In the context of the PIP Statute, the term "lawful" is defined broadly to mean "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the

35

provision of medical services or treatment." *Id.* § 627.732(11). Thus, courts interpreting this provision have considered whether a particular law or regulation is "relevant" or "applicable" to the provision of medical services or treatment when deciding if a violation renders a claim reimbursable. *See, e.g.*, *Geico v. Mas*, No. 19-cv-21183, 2020 WL 9604436, at *1, 5-6 n.3 (S.D. Fla. Mar. 31, 2020) (a physician's failure to adequately supervise physician assistant and physical therapy assistants in violation of Florida regulations established claim the clinic's services were unlawful); *State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.*, 145 F. Supp. 3d 1154, 1163-64 (S.D. Fla. 2015) (x-rays performed in violation of applicable regulations fell within the scope of the PIP Statute's prohibitions).

Notably, the PIP Statute expressly identifies violations of the Patient Brokering Act as automatically rendering claims unlawful and nonreimbursable. Fla. Stat. § 627.736(17) ("Claims generated as a result of activities that are unlawful pursuant to s. 817.505 are not reimbursable under the [PIP Statute]."). And surely if a violation of the Patient Brokering Act and the Anti-Kickback Statute can result in a charge being unlawful under the PIP Statute, then LaRocca's systematic violations of those same laws mean he has breached his legal duty under the wholly owned exemption to take charge of the LaRocca Clinics' substantial compliance with state law.

36

* * * * *

In sum, the text, structure, and purpose underlying the Clinic Act make plain an owner of an entity operating under the wholly owned exemption must undertake an affirmative duty for the entity's substantial compliance with federal and state law. If he fails to do so, that entity's charges are unlawful and noncompensable.

### C. The District Court failed to give meaning or effect to the full language of the wholly owned exemption and the Clinic Act.

Although the District Court rejected State Farm's interpretation of the wholly owned exemption's requirements, it failed to give any meaning or effect to the language the legislature used. Instead, the court offered a series of reasons it believed undermined State Farm's reading—but without saying what the exemption requires. As a result, it violated the maxim that "courts are required to give significance and effect to every word or phrase in a statute." *Polite v. State*, 973 So.2d 1107, 1113 (Fla. 2007).

In its decision denying summary judgment, the District Court claimed State Farm's proposed construction would lead to "absurd results" because it would require "perfect compliance" with all federal and state law. Dkt.361 at 10-14. And even if perfect compliance was not required, the court believed State Farm had not identified where to draw the line. *Id.* Finally, the court failed to give effect to the compliance requirement because no other court

37

had affirmatively addressed the meaning of the phrase "legally responsible for compliance" in the wholly owned exemption. *Id*. at 10-12.

Later, in its order denying reconsideration, the District Court claimed the Agency for Health Care Administration must affirmatively revoke an exemption before claims become noncompensable from a clinic operating in violation of such an exemption, and it suggested the compliance requirement could be ignored because the exemption was included in the Clinic Act's definition section. None of these rationales withstands scrutiny.

### 1. The District Court's concerns about absurd results are mistaken.

The District Court expressed concern that State Farm's interpretation would lead to an absurd result, requiring an owner to ensure "perfect compliance with obscure federal and state laws." Dkt.361 at 13-14. But that has never been State Farm's position.

In *Vizcay*, this Court explained that whatever line-drawing problem may exist in a one-off scenario, there is no issue where the owner fails to substantially comply with a duty imposed under the law. 826 F.3d at 1332. For instance, in that case a jury found the defendant, Dr. Vizcay, failed to substantially comply with her "legal responsibility" to systematically review billings as required under the Clinic Act. *See id*. at 1328-29, 1332 (citing Fla. Stat. § 400.9935(1)(g)).

38

The defendant argued there was insufficient evidence to support the verdict, but this Court disagreed. Reviewing the evidence in the record, the Court explained, although "[t]he Clinic Act does not state exactly how thorough a medical director's systematic review must be, . . . this case does not require us to define the bare minimum of the statute's review requirements." *Id.* at 1332. In other words, evidence a clinic's medical director (or an entity's owner) did not substantially comply with his or her obligations under the Clinic Act is sufficient to render the relevant charges noncompensable. *Id.*

The same analysis holds true here. State Farm has never advocated for a standard by which licensed medical professionals operating entities under the wholly owned exemption must guarantee "perfect compliance" with "isolated," "minor," or "technical" details of every federal or state law. *See* Dkt.372 at 14-15. At issue here is simply whether the Clinic Act requires the owner of an entity operating under the wholly owned exemption to substantially comply with the Anti-Kickback Statute and Patient Brokering Act, two state laws directly applicable to health care providers and designed to reduce fraud and protect patients from abusive practices.

An owner who does not ensure perfect compliance—say, because he failed to stop a rogue agent from making a payment for a referral—could still

claim he satisfied his legal responsibility for the entity's compliance with those statutes. Similarly, an owner who undertakes a good-faith effort to see that his entity complies with the law generally can defend the entity's charges on grounds of substantial compliance even if his clinic unknowingly violates a federal- or state-law requirement. *Cf. Vizcay*, 826 F.3d at 1332. And in the unlikely scenario an insurer challenged a clinic's charges based on a *de minimus* violation, a court (or jury) could credit the owner's diligence—even if the entity falls short of perfect compliance.

This case, however, does not present such a scenario. Here, LaRocca engaged in a wide-ranging scheme to pay kickbacks to induce patient referrals, which are expressly prohibited by the Anti-Kickback Statute and Patient Brokering Act. These laws are clear: a person is prohibited from offering *anything* in exchange for referring a patient or to induce future referrals. *See* Fla Stat. § 456.054(2); Fla Stat. § 817.505(1)(a). Here, it is undisputed LaRocca approved more than 12,600 purchases worth more than $850,000 to patient referral sources during a five-year period.

On top of all of that, the violations here were not done at the hands of a rogue agent whom LaRocca failed to detect. To the contrary, overwhelming and undisputed evidence established that LaRocca paid marketers to provide gifts and other things of value to induce patient referrals and reward referral

sources. He also reviewed and approved these expenses. Far from a hypothetical "good faith" effort, LaRocca did not attempt to comply with the law—and affirmatively violated it.

Thus, whatever the "bare minimum" of the wholly owned exemption's compliance requirement, the record here is replete with evidence that over many years LaRocca and his clinics intentionally and continuously provided kickbacks to induce and reward patient referrals, in violation of the Anti-Kickback Statute and Patient Brokering Act. As such, he violated the obligation he assumed to be "legally responsible for [his clinics'] compliance with . . . [two] state laws," rendering the LaRocca Clinics' charges noncompensable.

Nothing about this result is absurd. What is absurd is allowing the owner of a health care clinic to provide kickbacks for patient referrals for years—systematically violating the conditions of its exemption from a license it otherwise needs to operate—yet permit that clinic to receive compensation on claims when it was acting without a license and oversight by the Agency. The legislature surely did not intend such a result.

**2.    The District Court erred in selectively ignoring portions of the wholly owned exemption's plain language.**

In rejecting State Farm's arguments, the District Court drew a distinction between the first clause of the wholly owned exemption, which requires that entities be wholly owned by a licensed health care professional, and the last two clauses, which mandate an owner supervise the entity's business activities and be legally responsible for the entity's compliance with federal and state laws. *See* Dkt.420 at 5-6; Fla. Stat. § 400.9905(4)(g).

According to the District Court, only the failure to meet the first clause results in claims being automatically noncompensable. By contrast, in the District Court's view, the failure to abide by the subsequent clauses "require[s] a revocation of the exemption" by the Agency. Dkt.420 at 6.

This Court should reject the District Court's approach because it effectively renders the last two requirements of the wholly owned exemption meaningless. Moreover, it ignores a host of decisions properly highlighting the importance of each and every requirement in the exemption.

It is well settled that courts must interpret the language of a statute to "give full effect to all statutory provisions and construe related statutory provisions in harmony with one another." *Heart of Adoptions, Inc. v. J.A.*, 963 So.2d 189, 199 (Fla. 2007). The Clinic Act is no exception.

42

Courts have uniformly held entities that fail to meet *all* requirements of the wholly owned exemption and are not licensed in accordance with the Act are acting unlawfully and their charges are noncompensable. As one district court explained: "A wholly owned clinic is not exempt from the [Clinic Act's] licensing requirement if it is not supervised in accordance with the [Clinic Act]. . . . [The unlicensed entity at issue] qualifies for an exemption under [the wholly owned exemption] if one of the owners, a licensed health care practitioner, supervised the business activities and was legally responsible for [the unlicensed entity's] compliance with federal and state law." *State Farm Mut. Auto. Ins. Co. v. Performance Orthopedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1305 (S.D. Fla. 2018).[2]

---

[2] *Accord State Farm Mut. Auto. Ins. Co. v. Miami Med. Care Ctr., Inc.*, No. 15-cv-22660, 2016 WL 6962872, at *2 (S.D. Fla. Nov. 29, 2016) ("If the health care practitioner fails to supervise the clinic's business activities or does not remain responsible for legal compliance, then the clinic does not lawfully qualify for the exemption."); *Allstate Ins. Co. v. Vizcay*, No. 11-cv-804, 2014 WL 12619913, at *3 (M.D. Fla. Apr. 24, 2014) (ruling that the wholly owned exemption "requires Sara C. Vizcay to not only wholly own, but also supervise the business activities at the Wholly Owned Clinics."); *see also State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d 1343, 1350 (S.D. Fla. 2015) ("In order to lawfully qualify for the [wholly owned exemption], the licensed health care practitioner has a continuing obligation to supervise the business activities of the clinic and remain legally responsible for the entity's compliance with all federal and state laws.").

To be sure, no court has directly interpreted the "legally responsible" prong of the wholly owned exemption. But as noted above, courts had uniformly recognized each of the exemption's requirements must be given effect—at least until the decision below. Although those courts considered another prong, because that was the prong at issue, this does not take away from the import of the statute or render the rest of the language meaningless.

Put simply, there is no support for the District Court's enforcement of the requirement that an entity be wholly owned and disregard of the remaining requirements that the owner supervise the entity's business activities and be legally responsible for compliance. After all, the three requirements are part of a single statutory sentence. Under the District Court's reading, a health care practitioner could purchase an entity, avoid Florida's licensing regime, and then run roughshod over every other federal and state law—including Florida's Anti-Kickback Statute and Patient Brokering Act—yet the entity's charges to defrauded patients and insurers remain fully compensable. This makes no sense, and it cannot be the legislature's intent.

Nor is it appropriate to selectively enforce the exemption's requirements, as the District Court reasoned, because non-compliance with the first requirement means a clinic was "clearly never exempt from

44

licensing" while entities that, "at some point, started violating a federal or state law" were otherwise "legitimately exempt from licensing." Dkt. 420 at 6. Under that reading, courts may refuse to enforce the statute against clinics who fall out of compliance with the exemption's requirements.

That is absurd. For one thing, that would lead to circumstances in which a practitioner could purchase an entity but turn the day-to-day operations (*i.e.*, supervision of the business) over to a layperson. This would effectively thwart the legislative purpose behind the Clinic Act and the narrow exemptions to that statute's licensing regime. *Cf. State Farm Mut. Auto. Ins. Co. v. Filenger*, 362 F. Supp. 3d 1246, 1250 (S.D. Fla. 2018) (granting summary judgment on unjust enrichment and declaratory judgment claims where defendant chiropractors concealed the ownership interests held by lay individuals, but represented to the State of Florida that their clinics were operating in accordance with the wholly owned exemption).

In any event, that explanation is inapplicable here. As explained above, LaRocca personally violated the Anti-Kickback Statute and Patient Brokering Act throughout the life of the LaRocca Clinics. *See supra* pp. 15-17. Thus, there was *never* a period in which the LaRocca Clinics were "legitimately exempt from licensing." Dkt.420 at 6.

45

Finally, the District Court apparently viewed the placement of the wholly owned exemption in the definition section of the Clinic Act as a basis to disregard select aspects of the statutory text. In the court's view, "definitions" cannot be the "mechanism by which an exemption" is revoked. *See* Dkt.420 at 6-7.

Nothing permitted the District Court to ignore aspects of the statute's definition section—and it would be wrong to do so here. The legislature used the Clinic Act's definition section to define the requirements for various exemptions from licensure. Indeed, as section 400.9905(4) makes clear, the listed exemptions set forth the provisions that determine whether an entity qualifies as a "clinic" and therefore must be licensed under the Clinic Act. And the legislature made plain that when a clinic or entity is operating in violation of the Clinic Act, its charges are unlawful and noncompensable. Fla. Stat. § 400.9935(3).

If this Court adopts the District Court's view—that defined terms are essentially unenforceable—then entities could avoid the consequences for refusing to apply for a license and failing to satisfy any of the Act's exemptions. That cannot be right. *E.g.*, *United States v. Pauler*, 857 F.3d 1073, 1075-76 (10th Cir. 2017) (courts are not permitted to ignore a statute's "definition section").

46

What's more, the court's rationale is internally inconsistent. The requirement that an entity be wholly owned by a health care practitioner also appears in the statute's definition section. But as noted above, the District Court was fully willing to endorse and enforce that requirement. It gave no explanation why one clause of the wholly owned exemption should be given meaning while ignoring the remainder of the exemption. Accordingly, this Court should reject the district court's reading of the wholly owned exemption and enforce *all* its requirements equally.

### 3. The District Court's claim—that the Agency for Health Care Administration must revoke an entity's exemption—is directly contradicted by the statute and the Agency's own rules.

Finally, the District Court suggested the Florida Agency for Health Care Administration must affirmatively revoke a clinic's exemption due to lack of compliance with federal or state laws before any charges are rendered noncompensable. But that conclusion conflicts with both the Clinic Act and the Agency's own administrative rules implementing the exemption. Indeed, not even defendants attempted to make this argument.

The Clinic Act provides charges are noncompensable and unenforceable in two scenarios: (1) if the clinic "is required to be licensed . . . but . . . is not so licensed: and (2) if the clinic or entity "is otherwise operating in violation" of the Act's "licensing requirements." Fla. Stat. § 400.9935(3).

As several courts have noted, an entity that does not qualify for the wholly owned exemption, and does not have a license, "*operates unlawfully* under Florida law." *State Farm Mut. Auto. Ins. Co. v. First Care Sol., Inc.*, 232 F. Supp. 3d 1257, 1267 (S.D. Fla. 2017) (emphasis added); *accord Performance Orthopaedics & Neurosurgery*, 315 F. Supp. 3d at 1300; *Gov't Empls. Ins. Co. v. Quality Diagnostic Health Care, Inc.*, 369 F. Supp. 3d 1292 (S.D. Fla. 2019) ("The plain language of Fla. Stat. § 400.9935(3) makes clear that a claim for reimbursement made by a clinic that is not properly licensed or that is otherwise operating in violation of the Clinic Act, constitutes an unlawful charge that is 'noncompensable and unenforceable.'").

Thus, in *Vizcay*, this Court rejected the argument that an entity that was unlicensed and operating under the wholly owned exemption nonetheless could issue valid charges because the Clinic Act's remedy applied only to licensed clinics. 826 F.3d at 1331. It explained that "the [Clinic Act] covers both types of violations," including situations in which a clinic "violated the Act by failing to comply with the medical director duties enumerated in the statute." *Id.* at 1330. The Court properly acknowledged "there is no good reason to allow a judicial remedy for one type of violation but not the other." *Id.* at 1330-31.

48

The Clinic Act's structure also belies the District Court's claim that the Agency must affirmatively act to revoke an exemption. The legislature specified charges for services rendered by an unlicensed clinic or an entity operating in violation of the act's exemptions are automatically noncompensable. Fla. Stat. § 400.9935(3). In contrast, the legislature specified in a different section of the Act other remedies, such as revoking a license, issuing fines, or taking other administrative actions, that require affirmative action by the Agency to bring about. *See id.* § 400.995. If the legislature intended to require some affirmative action by the Agency to render a clinic's charges noncompensable, it would have put that provision in the section on the Agency's remedies.

Similarly, the Agency's rules mandate clinics operating under one of the Clinic Act's exemptions, including the wholly owned exemption, "must maintain an exempt status *at all times of operation*." Fla. Admin. Cod R. 59A-33.006(2) (emphasis added). And entities operating under an exemption lose that status whenever "a change occurs that negates . . . [an] entity's qualification for the exemption." *Id.* 59A-33.006(14).

Given this language, a clinic that is operating without substantially complying with relevant federal and state laws—particularly the Anti-Kickback Statute and the Patient Brokering Act—is "operat[ing] unlawfully"

and is not "maintain[ing] an exempt status at all times of operation." Accordingly, once such a clinic falls out of compliance, its charges are not compensable for the entire period it is operating unlawfully.[3]

Moreover, it is fanciful to think the Agency would even know to take action against an unlicensed entity—because there is no requirement that an entity apply for a certificate of exemption, or indeed, even notify the Agency of its operations. It is therefore doubtful the Agency would have the resources or ability to monitor and address violations.

The District Court's decision would encourage unsavory actors to self-determine their entity's status as an exempt clinic and bill unlawfully without restraint, safe in the knowledge the Agency could declare their charges noncompensable only on a prospective basis. That is a recipe for disaster—fly-by-night clinics would sprout up overnight to capture reimbursements they otherwise have no right to receive—undermining the licensure and exemption requirements the legislature calibrated carefully when it enacted the Clinic Act. And it ignores the powerful incentive provided by the legislature—a clinic charges are compensable only while it maintains its exempt status.

---

[3] Here, the evidence shows LaRocca and his clinics systematically and continuously violated the Anti-Kickback Statute and the Patient Brokering Act since 2017.

Moreover, a failure to enforce the requirements of the wholly owned exemption would encourage bad actors like LaRocca to flout their responsibility as health care providers to report reasonable suspicions a clinic is operating in violation of the Act. *See* Fla. Stat. § 400.9935(4)(d). Indeed, neither LaRocca nor any of the other health care providers with whom he worked notified the Agency of the kickback scheme. LaRocca and his clinics should not be rewarded for hiding their violations from the Agency.

Accordingly, the District Court's suggestion that the Agency must affirmatively revoke an entity's exemption before its charges are rendered noncompensable is wrong.

## II. State Farm is entitled to partial summary judgment or, at a minimum, a trial on the Clinic Act theory.

State Farm submitted undisputed evidence LaRocca knowingly provided remuneration or other things of value to individuals and entities who were sending patient referrals to his clinics. As a result, LaRocca and his clinics intentionally and repeatedly violated the Florida Anti-Kickback Statute and Patient Brokering Act. These undisputed facts entitled State Farm to summary judgment on its unjust enrichment, FDUPTA, and declaratory judgment claims under the Clinic Act theory for the entire period the clinics violated those laws, because LaRocca failed in his responsibility

51

for the clinics' compliance with these laws. At a minimum, though, State Farm should have been allowed to present this theory to a jury.

### A. Because there is no reasonable dispute LaRocca was violating the Anti-Kickback Statute and Patient Brokering Act, no reasonable juror could conclude he satisfied his responsibility for his clinics' compliance with state law.

At the summary-judgment stage, State Farm introduced overwhelming and undisputed evidence that LaRocca and his clinics violated Florida's Anti-Kickback Statute and Patient Brokering Act. Applying the correct interpretation of the Clinic Act's wholly owned exemption, no reasonable juror could conclude LaRocca fulfilled his obligation to be legally responsible for his clinics' compliance with those laws. Accordingly, any charges submitted by the clinics are noncompensable and unenforceable.

The Anti-Kickback Statute and Patient Brokering Act prohibit individuals, including health care providers, from offering any sort of remuneration with the intent of inducing patient referrals. The Anti-Kickback Statute makes it "unlawful for any health care provider . . . to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." Fla. Stat. § 456.054(2). The statute defines a "kickback" as any "remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an

incentive or inducement to refer patients for past or future services or items."
*Id.* § 456.054(1). "Violations of [section 456.054] shall be considered patient brokering and shall be punishable as provided in s. 817.505." *Id.* § 456.054(4).

The Patient Brokering Act similarly prohibits offering or paying any "commission, bonus, rebate, kickback, or bribe, directly or indirectly in cash or in kind" or engaging in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility." Fla. Stat. § 817.505(1)(a).

Although there is a dearth of authority interpreting these state statutes, both were enacted after and modeled upon the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. *See Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*, No. 19-cv-62078, 2022 WL 320952, at *9 (S.D. Fla. Jan. 29, 2022). Accordingly, the state statutes should be interpreted in the same manner as their federal counterpart. *Urquiola v. Linen Supermarket, Inc.*, No. 94-cv-14, 1995 WL 266582, at *2 (M.D. Fla. Mar. 23, 1995) ("Florida courts have held that when a Florida statute is modeled after a federal law on the same subject, the Florida statute will take on the same interpretation as its federal prototype as long as such interpretation is harmonious with the spirit and policy of the Florida legislation.").

The federal statute makes plain giving or offering to give anything of value, including a gratuity as a thank you, qualifies as an improper kickback. Indeed, the Office of the Inspector General for the Department of Health and Human Services, the agency charged with enforcing the federal Anti-Kickback Statute, has determined free meals and other gifts qualify as "remuneration" for purposes of a kickback. *See* OIG Compliance Program Guidance for Pharm. Mfrs., 68 Fed. Reg. 23,731, 23,738 (May 5, 2003); *see also United States ex rel. Bergman v. Abbot Labs.,* 995 F. Supp. 2d 357, 362, 375 (E.D. Pa. 2014) (marketers' use of "quarterly allowances" to arrange dinners, meetings, and other perks for physicians was cognizable under the federal Anti-Kickback Statute).

In this case, there is no serious dispute LaRocca intentionally and continuously violated Florida's Anti-Kickback Statute and Patient Brokering Act. The record evidence establishes he and his clinics intentionally provided hundreds of thousands of dollars of gifts and other items of value to potential and actual referral sources as a "thank you" for referring patients.

Since at least 2017, LaRocca provided dedicated credit cards owned and paid for by the LaRocca clinics specifically for marketers to purchase gifts and other items of value for referral sources. *See* Dkt.265-2 at 196-97, 199, 230; Dkt.256-12 at 46-47, 65-66. Those marketers made over 12,600

purchases, totaling over $850,000 on those dedicated credit cards. *E.g.*, Dkt.257-5 to Dkt.257-9; *see* Dkt.257 at 11-15. They spent tens of thousands of dollars on sports and entertainment tickets, clothing, spa and nail salon services, and even cruises for referral sources. *E.g.*, Dkt.257-13 at 5-9 (sports, entertainment, and theme parks); Dkt.257-13 at 10-12 (clothing and accessories); Dkt.257-13 at 1-4 (salon, spa, and beauty); Dkt.257-9 at LR0147830, LR0147843, LR0223256, LR0223367 (meals); Dkt.257-7 at LR0223183, LR0223199 (cruise tickets). They testified the gifts were meant to reward doctors and lawyers who referred patients to the LaRocca Clinics, or to induce new or continuing referrals. Dkt.256-9 at 86-87; Dkt.256-12 at 123, 126; Dkt.257-14 at LR0147988, LR0147905, LR0147910, LR0148046, LR0147910, LR0147825, LR0147827, LR01482042.

Moreover, LaRocca personally reviewed and approved these expenditures. Dkt.256-2 at 197. And he did so knowing the purchases were for patient referral sources. He testified he knew Florida law prohibits giving remuneration to potential or actual patient referral sources, but nonetheless agreed with rewarding those sources through free meals and other gifts. Dkt.256-2 at 201. Indeed, he testified one of the principal purposes of buying gifts for referral sources was to "thank" them for sending patients and ensure his clinics' competitive advantage over others. Dkt.256-2 at 201 ("Giving

food to a clinic [is a] thank you for having confidence in us. Thank you for referring your patients to us.").

Based on this record, no reasonable juror could conclude the widespread, systematic gift-giving operation of LaRocca and his clinics was for anything other than providing items of value to induce and reward patient referrals. That runs squarely afoul of the Anti-Kickback Statute and Patient Brokering Act.

The defendants' response rings hollow. They argued that, even accepting State Farm's construction of the wholly owned exemption and even accepting that LaRocca and his clinics engaged in the patient brokering scheme described, summary judgment was inappropriate because State Farm "fail[ed] to establish a nexus between the patients at issue in this case and the alleged kickback scheme." Dkt.291 at 1. But that misunderstands the predicate for liability.

LaRocca's systematic and intentional kickback scheme resulted in him failing to satisfy the wholly owned exemption's requirement that he bear legal responsibility for his clinics' compliance with the Anti-Kickback Statute and Patient Brokering Act. Therefore, the clinics were not operating in a lawful manner. This automatically results in all charges being unlawful and unenforceable under both the Clinic Act and the PIP Statute. *See* Fla. Stat.

§ 627.736(5)(b)(1)(b); *First Care Sol., Inc.,* 232 F. Supp. 3d at 1267-68 (holding charges by wholly owned exempt clinic operating unlawfully "are deemed noncompensable and unenforceable under the [Clinic Act]").

Moreover, under both Florida's Anti-Kickback Statute and Patient Brokering Act, a referral need not even occur for LaRocca to be liable. Liability attaches upon the mere *offer* of payment of anything of value to induce a referral. *See* Fla. Stat. § 456.054(1)-(2); *id.* § 817.505(1)(a).

Nothing is problematic or unfair about this result. LaRocca and his clinics continuously and intentionally provided kickbacks to reward past referrals and encourage new ones. There is no logical reason why State Farm would have to connect that conduct to any specific claim. As the legislature and the statewide grand jury found, the mere inducement of unlawful referrals misaligns the interests of medical providers and their patients, causes overutilization, and decreases healthy outcomes for patients. *See* 2000 Grand Jury Report at 4-6, 12. That risk of untoward influence is the same even if a provider doesn't make a payment for any specific referral but rather wishes to induce or reward referrals generally.

Otherwise, corrupt clinics, like LaRocca's, could pay a large lump sum in exchange for referrals, and then claim there was no proof any one referral was tainted by that payment. The law wisely does not pin a violation on only

those providers who pay kickbacks *in seriatim* to induce individual referrals and then keep detailed records of those payments. LaRocca's scheme is equally worthy of discouragement. Accordingly, summary judgment was and is appropriate on State Farm's Clinic Act theory.

### B. At a minimum, State Farm should have been permitted to present its Clinic Act theory to a jury.

At the very least, the District Court erred in prohibiting State Farm from advancing the Clinic Act Theory at trial.

Although the interpretation of a statute is a question of law, it is the quintessential role of a factfinder to resolve any "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For this reason, courts have regularly allowed juries to decide whether a clinic owner was complying with his or her obligations under the Clinic Act and the wholly owned exemption.

For instance, in *State Farm v. Silver Star Health & Rehab*, State Farm alleged the defendant clinic operated unlawfully under the wholly owned exemption because it was owned by a layperson. 739 F.3d 579, 582 (11th Cir. 2013). The district court asked the jury to decide the threshold issue of whether the clinic violated the Clinic Act's requirement of being "wholly owned" by its owner. Because the jury found the clinic was not complying with the conditions of the wholly owned exemption, it awarded State Farm

damages on its unjust enrichment claim, as well as a declaratory judgment stating State Farm had no obligation to pay the clinic's charges. *See* 739 F.3d at 582. This Court affirmed the district court's jury instructions in that case. *Id.*

Similarly, in the district court proceedings underlying *Allstate Insurance Co. v. Vizcay*, 826 F.3d at 1329, which involved both licensed clinics and unlicensed entities ostensibly operating pursuant to the wholly owned exemption, the district court asked the jury to determine whether the medical director of the licensed clinic substantially complied with her statutory obligations to systematically review bills to ensure they were not fraudulent. Dkt.393-2. The verdict form also required the jury to decide whether two prongs of the wholly owned exemption were satisfied: (1) whether the doctor who purportedly owned the unlicensed entity did in fact "wholly own" the clinic; and (2) whether she "supervise[d] the [entity's] business activities." Dkt.393-3.

And in *State Farm v. Performance Orthopedics & Neurosurgery, LLC*, a district court denied State Farm's motion for summary judgment, explaining there was a question of fact for the jury whether chiropractors who wholly owned the defendant clinic were supervising its business activities. 315 F. Supp. 3d at 1294.

59

Thus, even if the District Court was correct in denying summary judgment as to the Clinic Act theory—a tenuous proposition given the record evidence and the lack of any serious dispute about LaRocca's long-running scheme to pay kickbacks to reward and induce patient referrals—it was the jury's province to determine whether, through this misconduct, LaRocca violated his legal responsibility for the LaRocca Clinics' compliance with the Anti-Kickback Statute and Patient Brokering Act.

## CONCLUSION

The Court should vacate the District Court's judgment and remand this case with instructions for the court to enter summary judgment in State Farm's favor on liability and for further proceedings on damages on the Clinic Act theory. At a minimum, the judgment should be vacated and the case remanded to allow State Farm to present the Clinic Act theory to a jury.

Dated: February 29, 2024

Respectfully submitted,

/s/ Robert T. Smith

Eric T. Gortner
Michael J. Powers
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
312-902-5200

Robert T. Smith
Andrew J. Pecoraro
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006
202-625-3500
robert.smith1@katten.com
andrew.pecoraro@katten.com

*Counsel for Plaintiffs-Appellants*

60

## CERTIFICATE OF COMPLIANCE

As required by Rule 32(g)(1) of the Federal Rules of Appellate Procedure, I hereby certify that the foregoing Opening Brief of Plaintiffs-Appellants is in compliance with the type form and volume requirements. The brief was prepared using Microsoft Word 2016. It is proportionately spaced; uses a Roman-style, serif typeface (Georgia) of 14-point; and contains 12,891 words, exclusive of the material not counted under Rule 32(f) of the Federal Rules of Appellate Procedure.

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I had the foregoing Opening Brief of Plaintiffs-Appellants electronically filed by tendering it to the Office of the Clerk of the United States Court of Appeals for the Eleventh Circuit on February 29, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Plaintiffs-Appellants*