# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and
STATE FARM FIRE AND CASUALTY COMPANY,

Appellants,

v.

MICHAEL THOMAS LaROCCA, D.C., et al.,

Appellees.

On Appeal from the United States District Court for the
Middle District of Florida, Tampa Division

**ANSWER BRIEF OF APPELLEES MICHAEL LaROCCA, D.C., BLAKE LaROCCA, MICHAEL AUGUST MAJOR, D.C., JASON EDWARD HUNT, D.C., ANTOINETTE DENISE STEWART, D.C., RUTH GERMAIN GRIFFIN, D.C., CECILIO TORRES-RUIZ, M.D., LORI REBEIN, NP-C, SAVANNAH JANE MAYBERRY, D.C., MOURNIR SEMIA, TOBIAS BACANER, ALL ACCIDENTS CHIROPRACTIC CENTER, PLLC, LaROCCA CHIROPRACTIC CENTERS, LLC, LaROCCA CHIROPRACTIC INJURY CENTER, LLC, LaROCCA INJURY CENTERS LLC, and LaROCCA AUTO INJURY CENTER, LLC**

Marie Tomassi – FBN 0772062
Bradley A. Muhs – FBN 112102
Patrick M. Causey – FBN 86443
Lindsay Patrick Lopez – FBN 0022839
Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.
200 Central Avenue, Suite 1600
St. Petersburg, FL 33701
727-896-7171  /  727-820-0835 (fax)
Counsel for Appellees

No. 23-13979, State Farm Mutual Automobile Insurance Co., et al. v. Michael Thomas LaRocca, D.C., et al.

## APPELLEES' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1.1-26.1.3, the undersigned counsel of record for Appellees furnishes the following Certificate of Interested Persons and Corporate Disclosure Statement:

### Corporate Disclosure Statement

1.      All Accidents Chiropractic Center, PLLC is a privately held company and not related to any publicly traded companies.

2.      LaRocca Auto Injury Center, LLC is a privately held company and not related to any publicly traded companies.

3.      LaRocca Chiropractic Centers, LLC is a privately held company and not related to any publicly traded companies.

4.      LaRocca Chiropractic Injury Center, LLC is a privately held company and not related to any publicly traded companies.

5.      LaRocca Injury Centers LLC is a privately held company and not related to any publicly traded companies.

### Certificate of Interested Persons

The names of all trial judges, attorneys, persons, association of persons, firms, partnerships, and corporations that have or may have an interest in the outcome of this action, including subsidiaries, conglomerates, affiliates, parent

corporations, publicly traded companies that own 10% or more of a party's stock,

and all other identifiable legal entities related to any party in the case, are

     a.      All Accidents Chiropractic Center, PLLC, Defendant and Appellee.

     b.      Bacaner, Tobias, Defendant and Appellee.

     c.      Baroff, Aaron H., counsel for Plaintiffs and Appellants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

     d.      Brinn, Eugene P., counsel for Mara Gerber.

     e.      Bucklew, Susan C., District Court Judge.

     f.      Causey, Patrick, counsel for Defendants and Appellees.

     g.      Coalition Against Insurance Fraud, Amicus Curiae.

     h.      DeBeaubien, Simmons, Knight, Mantzaris & Neal, LLC, counsel for Plaintiffs and Appellants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

     i.      DeSouza, Terri, Third Party Marketer.

     j.      DiPaolo, Catherine, counsel for Defendants and Appellees.

     k.      Gerber, Mara, Third Party Marketer.

     l.      Gershenoff, Max, counsel for Amicus Curiae.

     m.      Goldsmith, John, counsel for Defendants and Appellees.

n.      Gortner, Eric T., counsel for Plaintiffs and Appellants State Farm
Mutual Automobile Insurance Company and State Farm Fire and Casualty
Company.

o.      Griffin, Ruth Germaine, D.C., Defendant and Appellee.

p.      Hunt, Jason Edward, D.C., Defendant and Appellee.

q.      Katten Muchin Rosenman, LLP counsel for Plaintiffs and Appellants
State Farm Mutual Automobile Insurance Company and State Farm Fire and
Casualty Company.

r.      Keough, Maria, Third Party Marketer.

s.      LaRocca Auto Injury Center, LLC, Defendant and Appellee.

t.      LaRocca, Blake, Defendant and Appellee.

u.      LaRocca Chiropractic Centers, LLC, Defendant and Appellee.

v.      LaRocca Chiropractic Injury Center, LLC, Defendant and Appellee.

w.      LaRocca Injury Centers LLC, Defendant and Appellee.

x.      LaRocca, Michael, D.C., Defendant and Appellee.

y.      Lopez, Lindsay, counsel for Defendants and Appellees.

z.      Major, Michael August, D.C., Defendant and Appellee.

aa.     Mayberry, Savannah Jane, D.C., Defendant and Appellee.

bb.     McCabe, Kyle, counsel for Defendants and Appellees.

cc.     Mountaineer Marketing and Management, Inc., Third Party Marketer.

dd.     Muhs, Bradley A., counsel for Defendants and Appellees.

ee.     Pecoraro, Andrew J., counsel for Plaintiffs and Appellants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

ff.     Porcelli, Anthony E., District Court Magistrate Judge.

gg.     Powers, Michael J., counsel for Plaintiffs and Appellants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

hh.     Raheb, Jeffrey Eduard, unserved Defendant.

ii.     Reale, John W., counsel for Plaintiffs and Appellants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

jj.     Rebein, Lori, NP-C, Defendant and Appellee.

kk.     Rivkin Radler, LLP, counsel for Amicus Curiae.

ll.     Sells, Jessica, Third Party Marketer.

mm.   Semia, Mournir, Defendant and Appellee.

nn.     Silverman, Ross O., counsel for Plaintiffs and Appellants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

oo.     Smith, Robert, counsel for Plaintiffs and Appellants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

pp.     State Farm Fire and Casualty Company, Plaintiff and Appellant.

qq.     State Farm Mutual Automobile Insurance Company, Plaintiff and Appellant.

rr.     Stewart, Antoinette Denise, D.C., Defendant and Appellee.

ss.     Tomassi, Marie, counsel for Defendants and Appellees.

tt.     Topkin, Sanford R., counsel for Dunedin Surgical Consultants, LLC.

uu.     Torres-Ruiz, Cecilio, M.D., Defendant and Appellee.

vv.     Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., counsel for Defendants and Appellees

ww.     Valdes, Bart R., counsel for Plaintiffs and Appellants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

xx.     Vayda, Stacie, Third Party Marketer.

/s/ *Lindsay Patrick Lopez*

Marie Tomassi
Florida Bar No. 772062
Bradley A. Muhs
Florida Bar No. 112102
Patrick M. Causey
Florida Bar No. 86443
Lindsay Patrick Lopez
Florida Bar No. 0022839
Trenam, Kemker, Scharf, Barkin,
  Frye, O'Neill & Mullis, P.A.
200 Central Avenue, Suite 1600
St. Petersburg, FL 33701
Phone: 727-820-3952 / Fax: 727-820-3972
Attorneys for Appellees

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument should be granted despite the District Court's correct interpretation of Florida's Health Care Clinic Act and the absence of any finding that Appellees violated the Anti-Kickback Statute or Patient Brokering Act, because State Farm is not a reliable narrator of events, and oral argument will therefore provide Appellees with an additional opportunity to ensure that the Court has received accurate and reliable information regarding the facts and proceedings below.

# TABLE OF CONTENTS

APPELLEES' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................... C-1

    Corporate Disclosure Statement ............................................. C-1

    Certificate of Interested Persons ........................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ......................................... i

TABLE OF CITATIONS ................................................................. iv

INTRODUCTION ............................................................................ 1

STATEMENT OF THE ISSUES ......................................................... 3

STATEMENT OF THE CASE ............................................................ 4

    (i)      Course of Proceedings and Disposition Below. ................. 4

    (ii)     Statement of the Facts. ................................................. 6

    (iii)    Standard of Review. ..................................................... 19

SUMMARY OF THE ARGUMENT ..................................................... 20

ARGUMENT .................................................................................. 22

I.    A PLAIN READING OF THE CLINIC ACT CONFIRMS THERE IS NO DUTY ON OWNERS TO ENSURE THEIR CLINICS' SUBSTANTIAL COMPLIANCE WITH FEDERAL AND STATE LAW. ........................................................................... 22

    A.    The Plain Language of the Clinic Act Supports Appellees' Interpretation that the Owner of the Clinic Be Held Accountable for Any Unlawful Activity. ........................................ 23

    B.    State Farm's Proposed Interpretations Lead to Absurd Results and Require Substantial Rewriting of the Statute, Whereas the Interpretation Advanced by Appellees Does Not. ............................................................................ 31

      C.      **The District Court Correctly Interpreted the Clinic Act.** .............**43**

**II.**     **THE TRIAL COURT CORRECTLY DENIED STATE FARM SUMMARY JUDGMENT, AND THE JURY OTHERWISE HEARD ALL TRIABLE CLAIMS.** .........**44**

      A.      **Genuine Issues of Material Fact Precluded Summary Judgment, and State Farm Failed to Show it Was Entitled to Judgment as a Matter of Law.** ........................................**44**

      B.      **State Farm Presented or Abandoned All Triable Claims.** .............**51**

**CONCLUSION** ..................................................................................**55**

**CERTIFICATE OF COMPLIANCE** ................................................**56**

**CERTIFICATE OF SERVICE** .........................................................**56**

# TABLE OF CITATIONS

***Cases***                                                                    **Page(s)**

1979 Fla. Op. Atty. Gen. 250 (Fla. A.G.),
  Fla. AGO 079-100, 1979 WL 31449 ...................................................................27

Allstate Insurance Co. v. Vizcay,
  826 F.3d 1326 (11th Cir. 2016) …………………………………37, 38, 39, 52

Bankston v. Then,
  615 F.3d 1364 (11th Cir. 2010) ...........................................................................19

Cary v. Curtis,
  44 U.S. 236 (1845)...............................................................................................28

CSX Transportation, Inc. v. Gen. Mills, Inc.,
  846 F.3d 1333 (11th Cir. 2017) ...........................................................................31

Gov't Emps. Ins. Co. v. DG Esthetic & Therapy Ctr., Inc.,
  2019 WL 1992930 (S.D. Fla. Apr. 19, 2019).............................................. 52, 53

Gov't Emps. Ins. Co. v. AFO Imaging, Inc.,
  2021 WL 734575 (M.D. Fla. Feb. 25, 2021)......................................................30

Gov't Emps. Ins. Co. v. Palm Wellness Ctr., LLC,
  2021 WL 5760734 (M.D. Fla. Dec. 3, 2021).......................................................30

Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.,
  2022 WL 2466039 (M.D. Fla. July 6, 2022) .............................................. 52, 53

Harris v. Garner,
  216 F.3d 970 (11th Cir. 2000) ............................................................. 24, 31, 37

In re Graupner,
  537 F.3d 1295 (11th Cir. 2008) ...........................................................................35

John R. Sand & Gravel Co. v. United States,
  552 U.S. 130 (2008)..............................................................................................39

Kokesh v. Am. S.S. Co.,
   747 F.2d 1092 (6th Cir. 1984) ..............................................................54

Makro Cap. of Am., Inc. v. UBS AG,
   543 F.3d 1254 (11th Cir. 2008) ................................................... 19, 51

Mamani v. Berzain,
   825 F.3d 1304 (11th Cir. 2016) .................................................. 42, 43

Mays v. U.S. Postal Serv.,
   122 F.3d 43 (11th Cir. 1997) ..............................................................32

Myore v. Nicholson,
   489 F.3d 1207 (Fed. Cir. 2007) ................................................... 23, 31

Republic of Argentina v. Weltover, Inc.,
   504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).....................42

Scala v. City of Winter Park,
   116 F.3d 1396 (11th Cir. 1997) ..........................................................54

Smith v. Owens,
   848 F.3d 975 (11th Cir. 2017) ............................................................19

State Farm v. Silver Star Health & Rehab,
   739 F.3d 579 (11th Cir. 2013) ............................................................52

State Farm Auto. Ins. Co. v. Fakhoury Med. & Chiropractic Ctr., P.L.L.C.,
   2023 WL 6167732 (M.D. Fla. Sept. 22, 2023)...................................30

State Farm Mut. Auto. Ins. Co. v. Fakhoury Med. & Chiropractic Ctr., P.L.L.C.,
   2023 WL 5162293 (M.D. Fla. Aug. 11, 2023) ...................................29

State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.,
   103 F. Supp. 3d 1343 (S.D. Fla. 2015) ...............................................30

State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery,
   LLC,
   315 F. Supp. 3d 1291 (S.D. Fla. 2018) ........................................ 49, 52

State Farm Mutual Automobile Insurance Co. v. First Care Solution, Inc.,
   232 F. Supp. 3d 1257 (S.D. Fla. 2017) ...............................................45

State Farm v. Performance Orthopaedics & Neurosurgery, LLC,
  2018 WL 2186496 (S.D. Fla. Feb. 16, 2018) ........................................29

United States ex rel. Greenfield v. Medco Health Solutions, Inc.,
  880 F.3d 89 (3d Cir. 2018).............................................. 47, 48, 49, 50

United States v. F.E.B. Corp.,
  52 F.4th 916 (11th Cir. 2022) ...............................................53

Whatley v. CNA Ins. Companies,
  189 F.3d 1310 (11th Cir. 1999) .............................................. 44, 46

**Statutes**

§ 379.233(2), Fla. Stat........................................................34

§ 379.233(3), Fla. Stat........................................................34

§ 400.9905, Fla. Stat .........................................................27

§ 400.9935, Fla. Stat .........................................................30

§ 400.9935(1) , Fla. Stat. ..................................... 26, 27, 28, 29, 38

§ 400.9935(3), Fla. Stat.......................... 23, 34, 38, 41, 49, 54

§ 400.9935(5), Fla. Stat.......................................................25

§ 627.732(11), Fla. Stat................................... 33, 37, 39

§ 817.505(4)(a)-(c), Fla. Stat ..................................................49

§ 400.990(2), Fla. Stat........................................................40

§ 400.9905(4)(g), Fla. Stat..... 1, 9, 12, 22, 25, 26, 27, 28, 29, 31, 36, 42, 44, 45, 50,
  .............................................................................. 51, 52

§ 400.9935(1)(f), Fla. Stat.....................................................37

§ 627.736(17), Fla. Stat.......................................................49

§ 456.054, Fla. Stat.  .................................................. 41, 49

§ 817.505, Fla. Stat ....................................................... 41, 49

§ 627.736(5)(b)(1)(b), Fla. Stat. ................................................. 40, 49, 54

§627.736(17), Fla. Stat............................................................ 40, 49, 54

**Rules**

Federal Rule of Appellate Procedure 26.1 ................................................4

Federal Rule of Appellate Procedure 32(f)............................................56

**Regulations**

Fla. Admin. Code r. 64E-5.502................................................34

**Other Authorities**

Felix Frankfurter, Some Reflections on the Reading of Statutes,
    47 Colum. L. Rev. 527 (1947) ............................................43

Black's Law Dictionary (11th ed. 2019) …………………………………….. 24, 25

H.L.A. Hart, "Changing Conceptions of Responsibility," in Punishment and
Responsibility 186, 196–97 (1968) ………………………………………………25

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts
170 (2012) ……………………………………………………………. 27, 28

# INTRODUCTION

Appellants, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (together, "State Farm"), sued Appellees, Michael LaRocca, D.C. ("Dr. LaRocca"), Blake LaRocca, Michael August Major, D.C., Jason Edward Hunt, D.C., Antoinette Denise Stewart, D.C., Ruth Germain Griffin, D.C., Cecilio Torres-Ruiz, M.D., Lori Rebein, NP-C, Savannah Jane Mayberry, D.C., Mournir Semia, Tobias Bacaner, All Accidents Chiropractic Center, PLLC, LaRocca Chiropractic Centers, LLC, LaRocca Chiropractic Injury Center, LLC, LaRocca Injury Centers LLC, and LaRocca Auto Injury Center, LLC (together, the "Clinics") (altogether, "Appellees"), seeking to invalidate *every single* insurance claim Appellees submitted, based on a novel reading of the "wholly owned" exemption under Florida's Health Care Clinic Act (the "Clinic Act"). That exemption, under which the Clinics operate, permits a healthcare provider to be exempted from the Clinic Act's licensing requirements "if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws." § 400.9905(4)(g), Fla. Stat.

State Farm's position was, and remains, that the phrase "legally responsible" in this exemption imposed upon Dr. LaRocca an affirmative duty to "ensure" that the Clinics were not violating any federal or state law, despite no court ever

1

interpreting the exemption that way, and because State Farm *alleged* violations of Florida's Anti-Kickback Statute (the "AKS") and Patient Brokering Act (the "PBA"), *all* claims submitted by Appellees were immediately rendered unlawful and unpayable. That untenable position is echoed on appeal by *amicus curiae* the Coalition Against Insurance Fraud (the "Coalition") in an *Amicus Curiae* Brief ("A.C.B.") that merely reiterates the arguments made in the Initial Brief ("I.B.").

The District Court rightly rejected State Farm's interpretation of the wholly owned exemption due to the bizarre and draconian effect it would have on healthcare providers and patients alike. The District Court also correctly rejected State Farm's request for summary judgment when State Farm did not present evidence of a *single claim* at issue that was submitted in violation of the AKS or the PBA. The District Court did not abuse its discretion by denying reconsideration of this ruling and rejecting State Farm's *revised* interpretation of the wholly owned exemption, when that interpretation: (1) was raised for the first time on reconsideration, and (2) is a flagrant aberration of the exemption's plain language.

Instead of proceeding to trial on its theory that claims were submitted in violation of the AKS or the PBA, State Farm **affirmatively abandoned** that theory and proceeded to trial solely on its theory that the services provided by Appellees were not "medically necessary." The jury heard all the evidence, and after a three-week trial, returned a verdict in favor of Appellees on <u>all</u> counts.

State Farm's trial strategy was essentially to short-circuit its burden of proof. Instead of proving that any *specific* claims violated the AKS or the PBA, State Farm sought to invalidate **all** claims based on an improper reading of the Clinic Act. State Farm's gambit did not pay off. Now it seeks to reverse the judgment, again relying on its unfounded and unproven aspersions that Appellees violated the AKS or the PBA. State Farm has never proven any wrongdoing, and simply asserting that it happened does not make it true. Accordingly, the Court should affirm the Judgment on appeal.

## STATEMENT OF THE ISSUES

I.      Does the plain language of the wholly owned exemption, which states an owner must be "legally responsible for the entity's compliance with all federal and state laws," impose upon the owner a duty to "ensure" the entity's "substantial compliance" with only certain federal and state laws related to healthcare and insurance, as argued by State Farm, despite the absence of any reference to a duty to "ensure" or the qualifier "substantial" and the absence of identification of which laws apply and which do not in this section of the Clinic Act?

II.      Whether the District Court (a) properly denied State Farm summary judgment when State Farm's motion was entirely premised on a reading of the wholly owned exemption that defied the exemption's plain language, State Farm failed to present evidence of a single claim that was paid as a result of an improper

kickback, and disputes of fact existed as to the nature of the payments; and (b) properly determined that statutory interpretation was not a jury question, but instead was within the exclusive province of the court?

## STATEMENT OF THE CASE

This appeal is the latest chapter in the legal odyssey involving State Farm's efforts to avoid paying valid claims submitted by Appellees for reimbursement. State Farm appeals an order denying its motion for summary judgment and an order denying its motion for reconsideration and rejecting its request to submit its legal theory regarding the Clinic Act to the jury. Each of these orders properly rejected State Farm's attempt to rewrite the clear language of the Clinic Act to ease its burden of proof in this case and in the many personal injury protection ("PIP") "fraud" cases it files across Florida.

**(i)     Course of Proceedings and Disposition Below.**

In October 2021, State Farm sued Appellees, claiming that they provided fraudulent and medically unnecessary treatment to 1,042 patients insured by State Farm. In November 2022, State Farm amended its complaint to assert claims against Dr. LaRocca and the Clinics for alleged violations of the AKS and PBA. (D.E 161). State Farm claimed that Dr. LaRocca and the Clinics paid kickbacks to third-party

marketers and referral sources in exchange for referring patients to the Clinics. (D.E. 161, pp. 82-102).[1]

State Farm moved for partial summary judgment on its kickback and patient brokering claims only. (D.E. 257, the "Summary Judgment Motion"). The Summary Judgment Motion focused on whether Dr. LaRocca violated a provision of the Clinic Act requiring the owner of a healthcare entity to be legally responsible for that entity's compliance with state and federal laws. (D.E. 257, pp. 16-17). State Farm did not submit evidence that any of the 1,042 patients at issue were referred to the Clinics because of an illegal kickback. Instead, State Farm advanced a "silver bullet" theory of liability: because the Clinics allegedly paid kickbacks *generally* for patient referrals, Dr. LaRocca failed to "ensure" the Clinics complied with all state and federal laws, thus *every* claim submitted for reimbursement by the Clinics was void. (D.E. 257, pp. 16-17, 25). The District Court properly denied State Farm's motion. (D.E. 361). State Farm sought reconsideration, and the District Court properly denied that motion as well. (D.E. 372, 390, 420).

State Farm claims that the District Court prevented it from presenting its kickback and patient brokering claims at trial. (I.B. at 21). That is not true. The

---

[1] Citation to the record are stated as [D.E. ___, pp ___], representing the District Court CM/ECF document number at page number.

District Court only prevented State Farm from advancing its "silver bullet" theory of liability, but allowed State Farm to proceed with its kickback and patient brokering claims under a more traditional approach—i.e., presenting evidence of claims submitted for specific patients who were referred to the Clinics based on illegal kickbacks. (D.E. 449, pp. 29-30). Despite claiming that it had "overwhelming evidence" that Dr. LaRocca and the Clinics paid illegal kickbacks for patient referrals, State Farm **voluntarily abandoned those claims three days before trial**. (D.E. 449, p. 28).

State Farm proceeded to trial on its medical necessity claims only and lost in decided fashion. (D.E. 482). After a three-week trial, the jury rejected State Farm's claim that every medical service provided to the 1,042 patients was fraudulent and medically unnecessary. (D.E. 482, p. 2, 6, 10, 14). Rather than challenge the jury's finding regarding medical necessity, State Farm appeals only the District Court's pretrial rulings regarding interpretation of the Clinic Act's wholly owned exemption.

**(ii)    Statement of the Facts.**

Dr. LaRocca has been a licensed Florida chiropractor for more than fifty years. (D.E. 496, p. 10). In approximately 2009, the Clinics transitioned to mainly treating patients involved in car accidents. (D.E. 496, p. 17). Over the next nine years, the Clinics grew, expanding to twelve offices serving the Tampa Bay area. (D.E. 496, pp. 20-22).

That growth caught State Farm's attention. Over the course of six years, State Farm repeatedly investigated Dr. LaRocca and the Clinics for purported insurance fraud, but never found evidence of impropriety. It started in 2015, when State Farm investigated the Clinics for allegedly billing State Farm for services that were not provided to patients, but State Farm found no evidence of wrongdoing. (D.E. 261, p. 5; 262-2, pp. 4-5). Then, in 2018, State Farm investigated whether the Clinics were owned, at least in part, by Dr. LaRocca's son, Blake LaRocca, and whether the Clinics had the appropriate license to provide patients with certain medical equipment. (D.E. 494, pp. 89-90, 97-98, 262-3, p. 14). Once again, State Farm's investigation turned up nothing. (D.E. 494, p. 90; 262-3, p. 14).

Finally, in a last-ditch effort, State Farm investigated whether the Clinics were using a "predetermined treatment protocol" for their patients, an ominous term State Farm coined to exploit the fact that patients involved in car accidents often suffer similar injuries that require similar treatments. (D.E. 494, pp. 90-93; 310-3, p. 5; 496, pp. 235-36). State Farm spent the next three years investigating the treatments offered by the Clinics before initiating the underlying lawsuit in October 2021. (D.E. 494, pp. 91; D.E. 1).

State Farm sued Dr. LaRocca, the Clinics, two other owners of some of the Clinics (Dr. Jason Hunt and Dr. Michael Major), and virtually every medical professional who worked at the Clinics, alleging claims for fraud, civil conspiracy,

unjust enrichment, violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), and for declaratory relief. (D.E. 1). The sole basis alleged for these claims in the Complaint was that Appellees provided medically unnecessary and fraudulent treatment to patients based on the "predetermined treatment protocol." (D.E. 1, pp. 1-7). State Farm claimed that Appellees used the same treatment protocol for every patient, regardless of that patient's unique circumstances, to "exploit" the patient's available PIP benefits. (D.E. 1, pp. 2-3).

After eight months of discovery, and five months after the deadline for amending pleadings, State Farm sought leave to amend its Complaint to add claims that Dr. LaRocca and the Clinics violated the AKS and PBA. (D.E. 50, 109). These new claims were premised on Appellees' employment of third-party marketers whose pay sometimes changed on a weekly basis, which State Farm somehow extrapolated as "proof" that the marketers were paid based on the number of patients they referred to the Clinics. (D.E. 161, p. 92, ¶ 237; pp. 100-01, ¶ 244). Over Appellees' objection, the District Court allowed State Farm to amend its Complaint and extended the discovery period by three months to allow discovery on State Farm's new theory of liability. (D.E. 114, 160, 190).

State Farm filed its Summary Judgment Motion on its claims that Dr. LaRocca and the Clinics violated the AKS and PBA. (D.E. 257). State Farm did not attempt to prove its claims by identifying individual patients referred to the Clinics because

of kickbacks; instead, State Farm attempted to invalidate **all** claims submitted by the Clinics through a twisted interpretation of the wholly owned licensing exemption under which the Clinics operated.  (D.E. 257, pp. 16-17, 25).

The wholly owned exemption provides that a healthcare entity need not obtain a license to operate in Florida if it is: (1) wholly owned by a licensed healthcare professional, who (2) supervises the business activities of the entity and (3) is "legally responsible for the entity's compliance with all federal and state laws." § 400.9905(4)(g), Fla. Stat.  Attempting to ease its burden of proof in this case and the many other "PIP fraud" lawsuits it files, State Farm moved for summary judgment, arguing that the exemption requirement that the owner be "legally responsible for the entity's compliance" required Dr. LaRocca to *ensure* that the Clinics complied with *all* federal and state laws.  (D.E. 257, pp. 16-17).  According to State Farm, because Dr. LaRocca allegedly failed to *ensure* the Clinics complied with all laws, including the AKS and PBA, the Clinics lost their exempt status and all claims they submitted for reimbursement were void and noncompensable.  (D.E. 257, pp. 17, 25).

The sole violation of the wholly owned exemption that State Farm argued (in the Summary Judgment Motion and all other filings) is that Dr. LaRocca failed to be "legally responsible" for the Clinics.  (D.E. 257, p. 16-17).  To support this argument, State Farm cited to entries on Appellees' credit card statements that it found

questionable, and suggested that the Clinics, through their marketers, used these purchases as illegal kickbacks for patient referrals. (D.E. 257, pp. 9-12). Importantly, and contrary to its *ad hominem* attacks made throughout the Initial Brief, State Farm provided no proof of *any* specific claims submitted in violation of the AKS or the PBA or even that these expenses were generally and undisputedly used for kickbacks.

Appellees opposed State Farm's Summary Judgment Motion on several grounds. First, Appellees correctly observed that State Farm added the word "ensure" to the wholly owned exemption, contrary to the plain language of the statute. (D.E. 274, pp. 11-13). Second, Appellees correctly argued that State Farm's interpretation would lead to absurd results: namely, insurance carriers could invalidate *every* claim submitted by an exempt entity if the carrier demonstrated that the entity violated *any* state or federal law. (D.E. 274, pp. 13-14). Third, Appellees presented evidence that the allegedly wrongful credit card purchases were actually innocuous purchases made for reasons *other than* kickbacks for patient referrals. (D.E. 274, pp. 6-7, ¶¶ 20, 22, pp. 18-19). Appellees also presented evidence that the variability in the marketers' pay was the result of the marketers being independent contractors who were paid an hourly rate and whose hours varied week to week. (D.E. 274, pp. 3-4, ¶ 5, response in opposition to Summary Judgment Motion, citing

evidence regarding how marketers were paid). This evidence presented by Appellees exposed issues of fact that made summary judgment improper.

The District Court denied State Farm's motion, finding that State Farm's novel interpretation of the wholly owned exemption was not recognized by any other court in this Circuit. (D.E. 361, pp. 11-13). The District Court agreed that State Farm's interpretation would lead to absurd results and place licensed medical providers in the impossible position of ensuring their clinics' perfect compliance with all federal and state laws. (D.E. 361, pp. 13-14).

State Farm sought reconsideration. (D.E. 372, the "Reconsideration Motion"). Reacting to the District Court's concerns about absurd results, State Farm advanced, for the first time, a "softened" interpretation of the wholly owned exemption. (D.E. 372, pp. 14-16). State Farm claimed the wholly owned exemption required Dr. LaRocca to make a good-faith effort[2] to ensure the Clinics "substantially complied" with only those federal and state laws that are *like* the AKS and the PBA. (D.E. 372, pp. 10-15). As with its Summary Judgment Motion, State Farm did not cite a single case that supported its newfound interpretation or identify a single claim submitted to State Farm as a result of an illegal kickback. (D.E. 372).

---

[2] The phrase "good-faith effort" does not appear in either the Summary Judgment Motion or the Reconsideration Motion, but is advanced by State Farm in its Initial Brief, *further* softening its interpretation of the exemption. (I.B. 4, 5, 40, 41).

Appellees opposed reconsideration, arguing that State Farm's new interpretation of the wholly owned exemption required a substantial revision of the statute, contrary to well-recognized canons of statutory interpretation. (D.E. 381, pp. 7-12). The table below compares the actual language of the wholly owned exemption with the language advocated by State Farm:

| Plain Language of § 400.9905(4)(g) | State Farm's Proposed Interpretation of § 400.9905(4)(g) |
|---|---|
| A health care provider can be exempted from licensing requirements "if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws." | A health care provider can be exempted from licensing requirements if one of the owners who is a licensed health care practitioner is supervising the business activities and **makes a good-faith effort to ensure** the entity's **substantial** compliance with all federal and state laws **that are applicable to health care providers and designed to reduce fraud and protect patients from abusive practices**. |

See (D.E. 372, pp. 8-16; I.B. at 3-5, 23-24, 38-40 (arguing the exemption does not require "'perfect compliance'" with every law "under the sun," but instead requires

12

the owner show a "good-faith effort" to ensure the clinics' "substantial compliance" with "particularly those laws aimed at protecting patients, preventing insurance fraud, and promoting fair competition in health care markets," like the AKS and PBA)); see also (A.C.B. at 21-24 (suggesting the owner must "at least take reasonable steps" to ensure compliance and "sufficiently supervise[]" the clinic)).

Appellees further argued that adopting State Farm's latest interpretation of the wholly owned exemption would *still* lead to absurd results, because State Farm's interpretation was incongruous with the plain language of the statute. (D.E. 381, pp. 12-14).

At the first pretrial conference, the District Court made an oral ruling denying the Reconsideration Motion. (D.E. 390). The District Court then invited the parties to brief how the kickback and patient brokering claims should be handled at trial. (D.E. 393, p. 1). State Farm and Appellees submitted competing proposals. State Farm claimed that its novel interpretation—previously rejected by the District Court on two occasions—should be presented to the jury for consideration. (D.E. 393, p. 2). Appellees countered that the District Court properly interpreted the wholly owned exemption as a matter of law, and that it should again reject State Farm's interpretation for a *third* time. (D.E. 403, pp. 1-2).

The District Court entered an order that: (1) explained in detail why she previously denied State Farm's Reconsideration Motion, and (2) held that State

Farm's interpretation of the wholly owned exemption was incorrect as a matter of law. (D.E. 420). The District Court correctly concluded that the wholly owned exemption did not place the burden on Dr. LaRocca to **ensure** that the Clinics substantially complied with state and federal laws relating to the provision of healthcare services. (D.E. 420, pp. 8-9). Thus, the District Court held that the jury could not decide whether Appellees' claims were noncompensable due to Dr. LaRocca's purported failure to "ensure" that the Clinics complied with the AKS and the PBA. (D.E. 420, p. 10).

Three days before trial, the District Court convened a second pretrial conference. (D.E. 449). At that pretrial conference, State Farm voluntarily abandoned its claims that Dr. LaRocca and the Clinics violated the AKS and the PBA, notwithstanding the District Court affirming that State Farm could still attempt to prove its kickback and patient brokering claims at trial:

> THE COURT: So starting with the plaintiffs, Number 1 on the plaintiffs' list of outstanding issues is the scope of evidence relating to defendants' marketing the Court will allow, based on the October 11, 2023, order denying State Farm's proposal for addressing the issue of whether the LaRocca Clinics operated in violation of HCCA's licensure requirements.
>
> Maybe I don't understand the question, because if you are going to prove the kickbacks, you're still going to have to offer evidence about it.

MR. SILVERMAN: Judge, so in light of your ruling -- and we had talked about this with the other side when we had our meet and confer over the instructions and jury verdict forms. And what we had said at the time is depending on how you ruled on our HCCA licensure motion, we were reserving judgment on whether we are going to go forward with what I'll call a direct kickback or patient brokering theory, that is, forget about the HCCA based on your ruling, but are we going to allege as a theory of liability that the claims weren't owed because he paid kickbacks or engaged in patient brokering.

We've made a decision. The decision is we are not going to go forward on those direct kickback and patient brokering theories.

. . .

THE COURT: Well, you still have the FDUTPA claim, for example. And I thought that the paying kickbacks was the basis for, at least one of the bases for the FDUTPA claim. Is that not right?

MR. SILVERMAN: Well, it has been. On the FDUTPA claim, we're going to go forward with a very simple theory.

And the very simple theory is that the FDUTPA violations, the underlying violations, the predicates for the FDUTPA are the submission of fraudulent claims to State Farm. That's what we're going to go forward with.

(D.E. 449, pp 27-30).

State Farm also convinced the District Court that it should be able to present evidence of the Clinics' marketing activities and alleged kickbacks at trial to support its claim that the treatment provided to patients was medically unnecessary:

THE COURT: Clearly I need to go back and look at this. So let me do that. And I will get back to you over the weekend and let you know so you'll know before trial starts.

MR. SILVERMAN: Can I just real quickly in terms of questions of law, I'm not posing this as a question of law. I'm posing this as a question of fact relevant to our theory of liability, which is, just to be clear, that we aren't saying are these kickbacks or is this patient brokering. What we're saying is, you know, how did this guy do this scheme?

Well, he paid all this money to these people to run out and buy things for referral sources. And then he ran all the referrals through the unnecessary treatment. I want to make that clear.

Is it clear, this is not a question of law?

THE COURT: I understand.

(D.E. 449, p. 45). State Farm argued that evidence detailing the Clinics' marketing activities—including emails, text messages, and other such documents—showed that the marketers and personal injury attorneys influenced the medical decision-making of the Clinics, calling into question the medical necessity of the treatments provided. (D.E. 449, pp. 27-29). Over Appellees' objection, the District Court allowed State Farm to introduce this evidence in support of its medical necessity claim. (October 13, 2023 email from law clerk (contained in Supplemental Appendix)).

At trial, State Farm introduced virtually all the evidence it submitted in support of its Summary Judgment Motion. State Farm called one marketer, Mara Gerber, to testify about her role in marketing on behalf of the Clinics. (D.E. 489, pp. 12-242). State Farm questioned Dr. LaRocca and Blake LaRocca extensively about the Clinics' marketing activities, including the alleged kickbacks. (D.E. 489, pp. 269-71, 281-302; D.E. 496, pp. 151-96). Over Appellees' objections, State Farm introduced evidence of the Clinics' marketing expenses contained in their general ledgers and tax returns; the Clinics' monthly credit card statements; and certain activity logs that purportedly tracked actions taken by the marketers on behalf of the Clinics. See, e.g., (D.E. 452, pp. 183-86; 489, pp. 27-30, 41, 164-76; Plaintiff's Trial Exhibit 4).

The only evidence State Farm did *not* introduce at trial that it submitted in support of its Summary Judgment Motion was the testimony of two marketers, Stacie Vayda and Terri Ann DeSouza, who pled the Fifth Amendment right against self-incrimination during their depositions when questioned about how they were paid by the Clinics. (D.E. 257, p. 5). State Farm failed to disclose in its Initial Brief that before trial, those two marketers revealed that they no longer intended to invoke their Fifth Amendment privilege related to whether they were paid kickbacks for patient referrals. (D.E. 449, p. 113). State Farm was given the opportunity to depose these individuals before calling them to testify, to evaluate whether the witnesses

could proceed without invoking the Fifth Amendment. (D.E. 432). State Farm chose to not depose these individuals, and did not call them to testify at trial.

Throughout trial, Appellees established that State Farm's evidence was misleading, incomplete, and unreliable. State Farm introduced almost a dozen "summary charts" that it claimed showed non-credible patterns in the treatment Appellees provided to their patients. (D.E. 483, pp. 2-3; Plaintiffs' Trial Exhibits 1-3, 5-14). Yet State Farm's witnesses had to acknowledge some of the charts contained inaccurate or misleading information. (D.E. 460, pp. 9-15, 478, pp. 144-48). State Farm's lead investigator, Angie Paschke, also admitted that she ignored evidence undermining State Farm's theory that Appellees were engaged in insurance fraud. (D.E. 494, p. 52). State Farm's chief expert, Dr. Stephen Perle, had to repeatedly walk back opinions on the medical necessity of the treatment Appellees provided to their patients. (D.E. 462, pp. 245-49; 474, pp. 29-30, 62-65, 85-95). Perhaps most alarming, despite claiming Appellees "fraudulently" treated 1,042 patients over six years, State Farm could not find a single patient willing to testify at trial in support of its claims. (D.E. 498, p. 119).

It is no surprise then, that after a three-week jury trial, the jury returned a unanimous verdict in Appellees' favor. (D.E. 482). The jury rejected State Farm's claim that the marketing activities—including the alleged kickbacks—rendered the medical services provided to patients fraudulent or medically unnecessary.

Although State Farm challenged thousands of treatments provided to 1,042 patients, the jury found that State Farm did not present evidence of a single medically unnecessary procedure.

This appeal followed. Instead of challenging the jury verdict or any rulings made at trial, State Farm challenges *only* the District Court's rulings made in the Order denying the Summary Judgment Motion and the Order denying the Reconsideration Motion (together, the "Orders"), in which the District Court rejected State Farm's various interpretations of the wholly owned exemption at issue.

**(iii) Standard of Review.**

This Court reviews the denial of a motion for summary judgment and issues of statutory interpretation using a *de novo* standard. See Bankston v. Then, 615 F.3d 1364, 1367 (11th Cir. 2010); Smith v. Owens, 848 F.3d 975, 978 (11th Cir. 2017).

The District Court's denial of a motion for reconsideration is reviewed for an abuse of discretion. See Makro Cap. of Am., Inc. v. UBS AG, 543 F.3d 1254, 1261 (11th Cir. 2008). Perhaps to avoid this standard and attempt to obtain *de novo* review of this issue, State Farm wrongly suggests that the District Court directed judgment as a matter of law when denying Reconsideration Motion. (I.B. at 22). To the contrary, the underlying case proceeded to a jury verdict in favor of Appellees on all counts and on all claims that were not affirmatively abandoned by State Farm. (D.E.

449, pp 27-30; 482). The District Court did not direct judgment in favor of Appellees, and to say otherwise is plainly incorrect. See infra, Section II(B).

## SUMMARY OF THE ARGUMENT

The District Court correctly held that the plain language of the wholly owned exemption does not require an owner to ensure his clinic's compliance with all state and federal laws. Instead, the definition of the term, "legally responsible," supports the conclusion that the wholly owned exemption requires the owner to be held *accountable* for the unlawful acts of his clinics. If the legislature had intended for the owner to "ensure" compliance with all laws, it would have used that specific language—just as it did in other sections of the Clinic Act.

State Farm's interpretation would lead to absurd results because it would require the owner to "ensure" the clinic's "compliance with all federal and state laws." Under this interpretation, *every* claim submitted to an insurance company by an exempt clinic would be noncompensable if the clinic violated any state or federal law.

State Farm's suggested alternative—first raised in its Reconsideration Motion—that the wholly owned exemption requires the owner make a good-faith effort to "ensure" only "substantial" compliance with laws related to healthcare and insurance only, is incongruous with, and would require substantial rewriting of, the exemption's plain language.

If the legislature intended for the clinic owners to "ensure" compliance with federal and state laws, or to ensure "substantial compliance" with only certain kinds of laws, it could have written the wholly owned exemption that way. The District Court properly read and applied the wholly owned exemption when it rejected State Farm's interpretation.

In addition to correctly rejecting State Farm's erroneous interpretation of the wholly owned exemption, the District Court also properly denied the Summary Judgment Motion and Reconsideration Motion because genuine issues of material fact existed. Appellees presented evidence that the alleged "kickbacks" were not illegal payments, and State Farm failed to identify *a single claim* submitted in violation of the law.

Indeed, even at trial State Farm did not introduce evidence of *a single claim* submitted in violation of the law. Instead, State Farm affirmatively **abandoned** this issue before trial and proceeded only as to the medical necessity of the treatments performed by Appellees. The District Court did not direct judgment in Appellees' favor on any claims, but correctly determined that the interpretation of the wholly owned exemption was a legal issue to be decided by the Court and not the jury.

The jury heard all evidence on the remaining factual issues, and ruled fully in favor of Appellees. State Farm cannot overturn the jury's verdict simply because its trial strategy, premised entirely on an incorrect interpretation of the wholly owned

exemption, failed.  The District Court's rulings and the jury verdict should be affirmed on appeal.

**ARGUMENT**

**I.  A PLAIN READING OF THE CLINIC ACT CONFIRMS THERE IS NO DUTY ON OWNERS TO ENSURE THEIR CLINICS' SUBSTANTIAL COMPLIANCE WITH FEDERAL AND STATE LAW.**

A healthcare provider can be exempted from licensing requirements "if one of the owners who is a licensed health care practitioner is supervising the business activities and **is legally responsible** for the entity's compliance with all federal and state laws."  § 400.9905(4)(g), Fla. Stat. (emphasis added).  As Appellees argued below, the plain language of this statutory exemption requires that an owner of an exempt clinic be held accountable for any violations of state or federal law committed by the clinic.  Any other interpretation would lead to unfair and absurd consequences and effectively rewrite the statute.  The District Court agreed, finding that State Farm "do[es] not make any suggestions as to where the Court should draw the line as to what constitutes a failure to comply with federal and state laws significant enough to amount to a licensing violation," and properly denied the Summary Judgment Motion.  (D.E. 361, pp. 13-14).

State Farm argues that the phrase "legally responsible" affirmatively requires Dr. LaRocca to **ensure** the Clinics' "substantial compliance" with "federal and state laws" for those Clinics to keep their exempt status.  (I.B. at 27, 29-30, 33, 37).  State

Farm further argues that because Dr. LaRocca allegedly did not **ensure** the Clinics' "substantial compliance" with the PBA and the AKS, the Clinics did not qualify for the licensing exemption, and thus <u>all</u> claims submitted by those Clinics were void and noncompensable. <u>See generally</u> § 400.9935(3), Fla. Stat. ("A charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge and is noncompensable and unenforceable.").

State Farm is mistaken. The commonsense interpretation asserted by Appellees both preserves the purpose of the Clinic Act and prevents the absurd and unfair results that would arise under State Farm's interpretation. The District Court correctly interpreted the plain language of the exemption, which is a decision that this Court should affirm.

**A.    The Plain Language of the Clinic Act Supports Appellees' Interpretation that the Owner of the Clinic Be Held Accountable for Any Unlawful Activity.**

"Statutory interpretation begins with the language of the statute, the plain meaning of which we derive from its text and its structure. If the statutory language is clear and unambiguous, the inquiry ends with the plain meaning." <u>Myore v. Nicholson</u>, 489 F.3d 1207, 1211 (Fed. Cir. 2007) (citations omitted). "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others, which is that courts must presume that a legislature says in a statute what

it means and means in a statute what it says there; and [w]hen the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." Harris v. Garner, 216 F.3d 970, 972-73 (11th Cir. 2000) (quotations omitted). In evaluating the plain meaning of the phrase "legally responsible," it is appropriate to refer to the legal dictionary. See id. at 973.

Black's Law Dictionary defines "responsible" as "[m]orally or legally answerable for the discharge of a duty, trust, debt, service, or other obligation; specif., marked by accountability to some higher authority for the execution of certain duties." RESPONSIBLE, Black's Law Dictionary (11th ed. 2019). Likewise, Black's defines "responsibility" as "[t]he quality, state, or condition of being duty-bound, answerable, or accountable." RESPONSIBILITY, Black's Law Dictionary (11th ed. 2019). Under its definition for "responsibility," Black's also contains the following commentary:

> [As for] the ambiguities of the word 'responsibility,' … it is, I think, still important to distinguish two of the very different things this difficult word may mean. **To say that someone is legally responsible for something often means only that under legal rules he is liable to be made either to suffer or to pay compensation in certain eventualities**. The expression 'he'll pay for it' covers both these things. In this the primary sense of the word, **though a man is normally only responsible for his own actions or the harm he has done, he may be also responsible for the actions of other persons if legal rules so provide**. Indeed in this sense a baby in arms or a totally insane person might be legally responsible — again, if the rules

> so provide; **for the word simply means liable to be made to account or pay and we might call this sense of the word 'legal accountability.'**

Id. (quoting H.L.A. Hart, "Changing Conceptions of Responsibility," in <u>Punishment and Responsibility</u> 186, 196–97 (1968)).

As these definitions demonstrate, the plain language of "legally responsible" in the context of Section 400.9905(4)(g) means that Dr. LaRocca can be held personally accountable for the Clinics' compliance with the law, and that the Clinic Act's disciplinary procedures apply to Dr. LaRocca personally if the Clinics were to violate federal or state law. <u>See generally</u> § 400.9935(5), Fla. Stat. ("Any licensed health care provider who violates this part is subject to discipline in accordance with this chapter and his or her respective practice act."). Even State Farm's definition of "responsible" supports Appellees' statutory interpretation. (I.B. at 28 (stating that "responsible" is defined by Black's Law Dictionary, in part, as "**accountable** for the execution of certain duties" (emphasis added))).

The other definitions of "responsible" offered by State Farm and the Coalition either do not make sense in context, or otherwise leave too much room for error or interpretation. For example, State Farm cites to an alternate definition of "responsible" as meaning to be "in charge of something" or to "look after something." (I.B. at 28 (citing Black's Law Dictionary and the Oxford English Dictionary)). Applying this definition to the wholly owned exemption would mean

that the owner would be "in charge of" or have a duty to "look after" the clinics' compliance with "all federal and state laws." However, that definition of the term "responsible" creates a statutory ambiguity, because it remains unclear whether to be "in charge of" or have a duty to "look after" compliance with the law means the same thing as having a duty to *ensure* the clinics' compliance, as State Farm asserts. Similarly, the Coalition's proposed definitions of "responsible," all of which involve some variation of having a duty to "take care of" or "look after" something or having "authority" over something, create the same ambiguity. (A.C.B. at 21). The better approach is to apply the definition that leaves no ambiguity: to be "responsible" for compliance means to be "accountable" for compliance.

State Farm and the Coalition also cite to Section 400.9935(1) to suggest that the phrase "legally responsible" as used in the wholly owned exemption means "to assume affirmative responsibility for the obligations of a clinic." (I.B. at 30-33); (A.C.B. at 9-10). But the comparison of Section 400.9935(1) to Section 400.9905(4)(g) is faulty.

First, these sections do not use the same language. While Section 400.9935(1) refers to a medical director "accept[ing] legal responsibility" for certain activities "on behalf of the clinic," Section 400.9905(4)(g) requires the owner be "legally responsible" for his clinics' actions. To *accept* legal responsibility to do something *on behalf of* someone or something else is plainly not the same thing as *being*

responsible for someone or something else. The former unequivocally requires someone to undertake some duty or obligation in the name or for the benefit of someone or something else; the latter does not. See, e.g., 1979 Fla. Op. Atty. Gen. 250 (Fla. A.G.), Fla. AGO 079-100, 1979 WL 31449 (holding that legal responsibility requires "the undertaking of a duty to exercise care in relation to another" and "one who is 'legally responsible' for another is liable for his acts or omissions toward that person").

Second, and more importantly, Section 400.9935(1) includes an enumerated list of the specific activities for which a medical director is required to accept legal responsibility on behalf of the clinic, including but not limited to "ensur[ing]" all practitioners are properly licensed; "ensur[ing]" proper billing; and, most strikingly, "ensur[ing] compliance with the . . . requirements of chapter 456, the respective practice acts, and rules adopted under [part X of chapter 400] and part II of chapter 408" of the Florida Statutes. Thus, the plain language of Section 400.9935(1) places an affirmative duty on someone to "ensure" compliance with the relevant laws; Section 400.9905, by its plain language, does not.

The differences between these statutory sections are not meaningless or insignificant. If the legislature had intended for "legally responsible for" compliance to mean "ensure" compliance, then there would be no need for the different language between 400.9935(1) and 400.9905(4)(g). See Antonin Scalia & Bryan A. Garner,

<u>Reading Law: The Interpretation of Legal Texts</u> 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning.").  As the District Court correctly noted, "[t]he legal responsibility imposed on the medical director of a licensed clinic is limited to activities enumerated in the statute, . . . [whereas] [t]he responsibility placed on the owner of an exempt entity under [State Farm's] interpretation is much broader— ensuring compliance with all federal and state law."  (D.E. 420, p. 7).

State Farm also refers to the exemption as being written in "positive terms," <u>see</u> (I.B. at 23, 27), but all that means is that the statute directs, mandates, or imposes something.  <u>See</u> <u>generally</u> <u>Cary v. Curtis</u>, 44 U.S. 236 (1845).  Undoubtedly, it does: the statute requires an owner to: (1) supervise the clinics' business activities, "*and*" (2) be legally responsible for the entity's compliance with the law.  § 400.9905(4)(g), Fla. Stat.  The exemption thus places two separate duties or obligations on the owner. As the District Court properly found, "[t]he medical director accepting legal responsibility for" the activities enumerated in Section 400.9935(1), including "having signs identifying the medical director or clinic director posted in a conspicuous location within the clinic . . . ensuring that all practitioners . . . maintain a current active and unencumbered Florida license, and conducting systematic reviews of clinic billings,"  is "more akin to supervising the business activities," and

Section 400.9935(1) does not task the medical director "with the clinic's compliance with all federal and state laws".  (D.E. 420, pp. 7-8).

And contrary to State Farm's suggestions, the phrase "legally responsible" modifies the noun "owner," and *not* the word "compliance."  (I.B. at 27).  It does not make sense for a "compliance" to be "legally responsible" for something, whereas it *does* make sense to hold an owner "legally responsible" for the clinics. State Farm's entire argument is premised on an incorrect reading of the statute.

State Farm and the Coalition cite two cases they contend support their interpretation of the statute—ostensibly because they both make a fleeting reference to clinic owners "ensuring" compliance with state and federal law.  (I.B. at 29-30 (citing State Farm v. Performance Orthopaedics & Neurosurgery, LLC, 2018 WL 2186496 (S.D. Fla. Feb. 16, 2018) and State Farm Mut. Auto. Ins. Co. v. Fakhoury Med. & Chiropractic Ctr., P.L.L.C., 2023 WL 5162293 (M.D. Fla. Aug. 11, 2023))); (A.C.B. at 16, 18-19 (same)).  These cases do not support State Farm's position.  In *both* cases, the courts' use of the word "ensure" was in the context of ruling on a motion to dismiss—for which all allegations must be taken as true—a complaint in which State Farm *itself* alleged that that the clinic owners had a duty under Section 400.9905(4)(g) to "ensure compliance" with all applicable state and federal laws. Performance Orthopaedics & Neurosurgery, LLC, 2018 WL 2186496, at *4, 9; Fakhoury Med. & Chiropractic Ctr., 2023 WL 5162293, at *1 (denying the motion

to dismiss); *see also* State Farm Auto. Ins. Co. v. Fakhoury Med. & Chiropractic Ctr., P.L.L.C., 2023 WL 6167732 (M.D. Fla. Sept. 22, 2023) (referencing the allegations in the complaint that was the subject of the Fakhoury opinion cited by State Farm in its Initial Brief). In that context, it makes sense for the courts to use the word "ensure" as stated in State Farm's complaints, but it does not amount to the courts *adopting* State Farm's position.

Likewise, the cases cited in the Coalition's *Amicus Curiae* Brief are easily distinguished and do not advance State Farm's position. (A.C.B. at 16-18 (citing State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc., 103 F. Supp. 3d 1343 (S.D. Fla. 2015), wherein the clinics did not qualify for the exemption because they were not "wholly owned" by licensed medical doctor; Gov't Emps. Ins. Co. v. AFO Imaging, Inc., 2021 WL 734575 (M.D. Fla. Feb. 25, 2021), wherein plaintiff alleged the non-exempt clinic was operating without the medical director required by Section 400.9935, and Gov't Emps. Ins. Co. v. Palm Wellness Ctr., LLC, 2021 WL 5760734 (M.D. Fla. Dec. 3, 2021), wherein plaintiff alleged that a non-exempt clinic appointed a "phony" medical director and had services performed by unlicensed providers)).

Also, this Court is not bound to consider the above-referenced district court decisions, particularly when, as correctly noted by the District Court here, "[n]one of the cases cited . . . stand for th[e] proposition" that the wholly owned exemption

placed upon Dr. LaRocca an affirmative duty to ensure the Clinics' compliance with the law.  (D.E. 361, p. 10); see, e.g., CSX Transportation, Inc. v. Gen. Mills, Inc., 846 F.3d 1333, 1338 (11th Cir. 2017) ("remarks made in the course of a decision but not essential to the reasoning behind that decision" amount to mere dicta).

Here, the plain language of Section 400.9905(4)(g) requires that the clinic's owner be held accountable if the clinic violates the law.  This is the most logical reading of the statute's plain language.  On the other hand, as further explained in the next subsection, State Farm's interpretation would lead to absurd results and would require significant rewriting of the statute.  Under the cardinal rule of statutory interpretation, the plain language of the statute as advanced by Appellees must prevail.  See Harris, 216 F.3d at 972-73; Myore, 489 F.3d at 1211.

**B.**  **State Farm's Proposed Interpretations Lead to Absurd Results and Require Substantial Rewriting of the Statute, Whereas the Interpretation Advanced by Appellees Does Not.**

The licensure exemption for wholly owned clinics applies when the owner supervising the business activities is a licensed healthcare practitioner who "is legally responsible for the entity's **compliance** with **all federal and state laws**." (Emphasis added).   In the District Court, State Farm advanced two different interpretations of the wholly owned exemption.

At summary judgment, State Farm advocated for a "strict" reading of the statute, requiring clinic owners to "ensure" their clinics were complying with all

federal and state laws. (D.E. 257, pp. 16-17). After the District Court rejected its argument, State Farm sought reconsideration and argued, for the first time, that the exemption requires the clinic owner only "substantially comply" with the purported duty to ensure the clinic's "substantial compliance" with only the PBA and AKS. (D.E. 372, p. 11-16).

The District Court correctly rejected State Farm's first interpretation of the exemption in the Summary Judgment Motion and did not abuse its discretion in rejecting State Farm's subsequent effort to soften its position in the Reconsideration Motion. See generally Mays v. U.S. Postal Serv., 122 F.3d 43, 46 (11th Cir. 1997) (noting that "a motion to reconsider should not be used by the parties to set forth new theories of law"). The Orders on appeal should be affirmed.

      1.    State Farm's Interpretation of the Wholly Owned Exemption in its Summary Judgment Motion Leads to Unfair and Absurd Results.

In its Summary Judgment Motion, State Farm argued that the wholly owned exemption required the clinic owner to ensure his clinics' compliance with all federal and state laws, without any proposed limitations. (D.E. 257, pp. 16-17); see also State Farm's Reply in support of summary judgment (D.E. 285, pp. 3, 4) (stating: "the HCCA requires owners to ensure compliance with laws, such as the PBA and AKS. . . . [Dr. LaRocca] was *required* to ensure compliance with state and federal laws for *all patients*, not just some.") (emphasis in original)). The only place in the

32

Summary Judgment Motion that State Farm uses the terms "substantial compliance" or "substantially comply" is when discussing the definition of the term "lawfully" rendered, as used in the PIP statute, which is a completely different statutory provision than the one at issue. (D.E. 257, p. 16); see also § 627.732(11), Fla. Stat. The District Court rejected State Farm's interpretation in favor of the plain language of the exemption, and found that State Farm's interpretation would naturally lead to absurd results. (D.E. 361, pp. 9-14).

State Farm now remarkably asserts that it has "never advocated for" a requirement that a clinic owner "must guarantee 'perfect compliance' with" every federal and state law. (I.B. at 38-39). But State Farm is talking out both sides of its mouth, because that is **exactly** what State Farm initially advocated for in its Summary Judgment Motion. Indeed, the District Court recognized this in denying summary judgment, stating "Plaintiffs fail to adequately contend with Defendants' argument that it would lead to absurd results if the expectation was perfect compliance with all federal and state laws, absent which a clinic's license would be invalid and every claim submitted for reimbursement void." (D.E. 361, p. 13).

Under the first interpretation advanced by State Farm, the statute would require the clinic owner to ensure that his clinic(s) never violated *any single federal or state law*, and if there was *ever* a violation of *any* law, **none** of the claims

submitted by the clinic(s) would be compensable because the clinic(s) would no longer be exempt from licensure.  See generally § 400.9935(3), Fla. Stat.

This position is absurd and would have a significant impact on patients and clinics alike.  For example, if a clinic had a "grand opening" celebration of a new location during which ten balloons were released into the air, under State Farm's reading of the exemption *all* claims submitted by *all* clinics supervised by a common owner would be immediately rendered unpayable.  See generally § 379.233(2), Fla. Stat. ("It is unlawful for any person, firm, or corporation to intentionally release, organize the release, or intentionally cause to be released within a 24-hour period 10 or more balloons inflated with a gas that is lighter than air[.]").

Applying the same example to Appellees' interpretation of the exemption, the claims still would be payable, but the owner would be "legally responsible" for paying the $250 fine imposed for the improper release of the balloons.  § 379.233(3), Fla. Stat.  This is just one of countless other potential illogical consequences that would arise from State Farm's suggested draconian enforcement of all federal and state laws.

The unjust effect of State Farm's interpretation goes beyond the mere hypothetical.  In the District Court, State Farm tried to advance the argument that Appellees violated a Florida administrative law that requires protective padding be given to patients for x-rays.  (D.E. 307, pp. 12-14); see also Fla. Admin. Code r.

64E-5.502. Under State Farm's interpretation of the exemption, if the Clinics failed to provide protective padding to a patient when performing an x-ray—even once—the Clinics' exemption would be invalidated and every claim submitted for reimbursement would be void.

If the Court were to find, as State Farm advocated in its Summary Judgment Motion, that "legally responsible" for compliance means "ensuring" compliance with "all state and federal laws," then the impact of its ruling would be felt equally in cases involving violations of either the most significant or the most minimal of state and federal laws.  The District Court correctly found that this interpretation would lead to absurd results and unjust consequences when it denied the Summary Judgment Motion, which ruling should be affirmed on appeal.  See In re Graupner, 537 F.3d 1295, 1302 (11th Cir. 2008) ("Because the legislature is presumed to act with sensible and reasonable purpose, a statute should, if at all possible, be read 'so as to avoid an unjust or absurd conclusion.' ").

2.      State Farm's Interpretation of the Wholly Owned Exemption Set Forth in the Reconsideration Motion Would Require a Substantial Rewriting of the Statute.

Likely in an effort to assuage the District Court—and now this Court—of any concerns regarding its interpretation of the exemption, State Farm advanced in its Reconsideration Motion and advocates on appeal for a reading of the exemption that defies the plain language of the statute and requires the owner only take steps to

ensure the clinics' "substantial compliance" with only two laws: the AKS and the PBA. (D.E. 372, pp. 10-11, 14-16; I.B. at 3-5, 32-33, 38-40). But State Farm's position is facially inconsistent with, and would in fact require a substantial rewriting of, the wholly owned exemption, which requires by its plain language that the owner be legally responsible for the clinics' **"compliance"** with **"all"** federal and state laws:

| Plain Language of § 400.9905(4)(g) | State Farm's Proposed Interpretation of § 400.9905(4)(g) |
|---|---|
| A health care provider can be exempted from licensing requirements "if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws." | A health care provider can be exempted from licensing requirements if one of the owners who is a licensed health care practitioner is supervising the business activities and **makes a good-faith effort to ensure** the entity's **substantial** compliance with all federal and state laws **that are applicable to health care providers and designed to reduce fraud and protect patients from abusive practices**. |

See (I.B. at 3-5, 23-24, 38-40); see also (A.C.B. at 21-24).

If the legislature intended for the owner to make a good-faith effort or take reasonable steps to ensure "substantial compliance" with those laws related to healthcare fraud *only*, then it certainly could have written the statute that way, such as it did with the PIP statute. See, e.g., § 627.732(11), Fla. Stat. (" 'Lawful' or 'lawfully' means in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."); see also § 400.9935(1)(f), Fla. Stat. (requiring a medical director to "[e]nsure compliance with the recordkeeping, office surgery, and adverse incident reporting requirements of chapter 456, the respective practice acts, and rules adopted under this part and part II of chapter 408"). But the legislature did not do so, and State Farm's efforts to combine these disparate statutory provisions should be rejected. See generally (I.B. at 35-36 (arguing that the PIP statute's definition of "lawful" should be read in *pari materia* with the Clinic Act)); cf. Harris, 216 F.3d at 972-73 (the plain language of a statute is controlling).

State Farm relies on Allstate Insurance Co. v. Vizcay to support its argument that only "substantial compliance" is necessary. 826 F.3d 1326 (11th Cir. 2016). Vizcay has limited application here. In Vizcay, this Court determined that a clinic was liable for the omissions of its medical director based on a statute that reads: "Each clinic shall appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities," including

"[c]onduct[ing] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful," on behalf of the clinic. Vizcay, 826 F.3d at 1328, 1331 (quoting § 400.9935(1), Fla. Stat.). That statute also provides "[a]ll charges or reimbursement claims made by or on behalf of a clinic that is required to be licensed under this part, but that is not so licensed, or that is otherwise operating in violation of this part, are unlawful charges." Id. at 1328 (quoting § 400.9935(3), Fla. Stat.).

This Court determined that the statute requires a clinic to appoint a medical director "who will agree to accept legal responsibility for carrying out the duties enumerated in the statute as the agent of the clinic." Id. at 1331 (emphasis in original). The Court ultimately held that under this interpretation and "hornbook law that 'a principal may be held liable for the acts of its agent that are within the course and scope of the agency,' " the clinic was liable for the "medical director's failure to substantially comply with the medical director duties enumerated in the [statute]." Id.

Nowhere in Vizcay did this Court equate "legal responsibility" with "substantial compliance" with the law. The Court was not even evaluating any of the exceptions to licensure under the Clinic Act. Instead, the Court was evaluating the obligation of a licensed clinic to employ a medical director to prevent "unlawful" billing, and seemingly employed the PIP statute, which defines "lawful" as "in **substantial compliance** with **all relevant applicable** criminal, civil, and

administrative requirements of state and federal law," to determine the contours of *un*lawfulness. § 627.732(11), Fla. Stat. (emphasis added). Further, the Court's decision relied on basic agency law to hold the clinic liable for the actions of its employee. Conversely, there are no issues of agency in the present case, and the **terms "lawful" and "unlawful" do not appear anywhere in the wholly owned exemption** at issue. Vizcay is inapplicable to the issues now before the Court.

In another vain attempt to appear reasonable, State Farm asked the District Court and now implores this Court to adopt its interpretation of the exemption in the context of *this specific case*, supposedly because of the statutes implicated (i.e., the AKS and the PBA) and the particular facts alleged (but never proved) regarding payments made to marketers. (D.E. 372, pp. 14-16; I.B. at 39-41); see also (A.C.B. at 23-25 (citing to the "extensive and willful pattern of fraudulent and unlawful activity" alleged by State Farm "in the present case")). State Farm's argument ignores the facts below, and also ignores the basic premise of *stare decisis*, that how the Court interprets the exemption in this case can be, and will be, applied to other claims and factual scenarios in the future. See John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 139 (2008) (noting that "*stare decisis* in respect to statutory interpretation has 'special force' "). The Coalition expressly recognized this impact, asserting that "the Court's rulings are likely to have an impact well beyond this case." [Motion to File *Amicus Curiae* brief, Dkt. 29, pg. 6]. Indeed, as set forth in

Appellees' response in opposition to State Farm's motion in limine, State Farm has a routine practice of bringing similar fraud actions against healthcare providers across the country. (D.E. 355, pp. 11-13).

The interpretation of the wholly owned exemption advanced by State Farm in the Reconsideration Motion and now on appeal blatantly defies the plain language of the statute. The District Court did not abuse its discretion when it rejected State Farm's invitation, raised for the first time on reconsideration, to effectively rewrite the Clinic Act to conform to State Farm's tortured interpretation. The District Court's Orders, and the judgment subsequently entered against State Farm, should be affirmed.

3.      Appellees' Interpretation of the Wholly Owned Exemption
         Preserves the Purpose of the Statute As Written.

Contrary to State Farm's argument, Appellees' interpretation of the wholly owned exemption is consistent with and does not undermine, invalidate, or flout the purpose of the Clinic Act. (I.B. at 24, 33, 35, 44); see also § 400.990(2), Fla. Stat. (legislative finding of need "to prevent significant cost and harm to consumers").

Under Appellees' interpretation, where the owner of an exempt clinic is not charged with ensuring the clinic's compliance with state and federal law but is legally responsible for violations, claims for reimbursement submitted *in violation of the law* would still be noncompensable. See §§ 627.736(5)(b)(1)(b), 627.736(17),

Fla. Stat.  Under this interpretation, State Farm could have proven at trial *which* specific claims were illegal and noncompensable, and if State Farm had met its burden, it presumably could have recovered for amounts paid for the specific claims. But State Farm made the tactical decision not to do so, actually *abandoning* those claims before trial.  See infra Section II.

State Farm's and the Coalition's suggestions that Appellees' interpretation would undermine the purpose of the Clinic Act and clinic owners would be incentivized to permit violations of the law are nonsensical.  Under Appellees' interpretation, the clinic owner still would be "legally responsible"—i.e., held accountable—for the clinic's illegal actions.  Such violations come with potentially steep penalties that would be borne by the clinic owner *if they were proven to exist*. See, e.g., § 400.9935(3), Fla. Stat. (stating that a person who makes or causes to be made an unlawful charge commits theft); §§ 456.054, 817.505, Fla. Stat. (making a violation of the AKS a felony).  Also, any claims proven to be submitted in violation of the law still would be noncompensable, so there would be no "incentive" for the clinic owner to permit the clinic to submit illegal claims, and the purpose of the Clinic Act would be preserved.  Here, notwithstanding State Farm's derogatory assertions throughout the Initial Brief, State Farm never proved that Dr. LaRocca, the Clinics, or anyone else violated the law.

State Farm and Appellees advance competing interpretations of Section 400.9905(4)(g). Appellees' interpretation—that the owner be ultimately held accountable for any violations of law by the clinic—comports with the plain language of the statute and preserves the purpose and intent underlying the relevant healthcare and insurance laws. Conversely, State Farm's arduous interpretation—that the owner must use good-faith efforts to **ensure** the clinics "substantially comply" with only those laws dealing with unlawful claims, patient brokering, and kickbacks—would require the Court to add modifiers and constraints to the statute that simply do not exist and therefore are unknown to anyone reading the statute. As this Court succinctly put it in Mamani v. Berzain, 825 F.3d 1304, 1309–10 (11th Cir. 2016):

> [State Farm] would render the plain unplain by reading the statutory language to say what it does not say and mean what it does not mean. . . . [W]hat [State Farm] would have [the Court] do is not actually read, interpret, or construe statutory language but amend, modify, or revise it.
>
> To conform the statutory language to [State Farm's] liking [the Court] would have to strike [certain words] and write in their place [other words and clauses]. [The Court] could do all of that without any problem—if only [it] were Congress. But unless and until the first and third branches of government swap duties and responsibilities, [the Court] cannot rewrite statutes. See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618, 112 S.Ct. 2160, 2168, 119 L.Ed.2d 394 (1992) ("The question ... is not what Congress 'would have wanted' but what Congress

enacted in the [statute]."); see also Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 533 (1947) ("A judge must not rewrite a statute, neither to enlarge nor to contract it. Whatever temptations the statesmanship of policy-making might wisely suggest, constructions must eschew interpolation and evisceration.").

The Court should follow its precedent in Mamani, reject State Farm's request to rewrite the statute, and affirm the judgment on appeal.

### C. The District Court Correctly Interpreted the Clinic Act.

State Farm accuses the District Court of "selectively ignoring portions of the wholly owned exemption's plain language," and the Coalition charges the District Court with giving "due consideration" to only the question of whether Dr. LaRocca owned the Clinics but ignoring Dr. LaRocca's supervision of and responsibility for the Clinics. (I.B. at 42-47; A.C.B. at 28). Those assessments are unfair and inaccurate.

The District Court correctly read and interpreted the wholly owned exemption and found that the exemption does not require Dr. LaRocca to ensure the Clinics' compliance with all state and federal laws. (D.E. 361, pp. 10-14; 420, pp. 5-10). The fact that the District Court disagreed with State Farm's interpretation does not mean that the District Court ignored the second and third clauses of Section 400.9905(4)(g), as State Farm and the Coalition suggest. (I.B. at 44; A.C.B. at 28).

State Farm and the Coalition are unable to show that the District Court ignored any portion of Section 400.9905(4)(g).  State Farm never presented any evidence that Dr. LaRocca (1) is not a licensed health care practitioner; (2) is not supervising the Clinics' business activities; or (3) is not legally responsible (i.e., personally accountable) for any violations of law committed by the Clinics.  The District Court properly interpreted the Clinic Act, and should be affirmed.

## II.  THE TRIAL COURT CORRECTLY DENIED STATE FARM SUMMARY JUDGMENT, AND THE JURY OTHERWISE HEARD ALL TRIABLE CLAIMS.

### A.  Genuine Issues of Material Fact Precluded Summary Judgment, and State Farm Failed to Show it Was Entitled to Judgment as a Matter of Law.

State Farm argues that it was entitled to partial summary judgment on its unjust enrichment, FDUTPA, and declaratory judgment claims under the Clinic Act "because [Dr.] LaRocca failed in his responsibility for the clinics' compliance with" the AKS and PBA.  (I.B. at 51-52).  Once again, State Farm is mistaken.

Summary judgment is appropriate if the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law, and "[i]n making this determination, [the court must] view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Whatley v. CNA Ins. Companies, 189 F.3d 1310, 1313 (11th Cir. 1999).

State Farm's Summary Judgment Motion was based *entirely* on the argument that Section 400.9905(4)(g) of the Florida Statutes required Dr. LaRocca to "ensure" the Clinics' compliance with the AKS and the PBA, and that because he allegedly did not do so, none of the claims submitted by the Clinics were payable for failure to satisfy the requirements of the wholly owned exemption. (D.E. 257). As explained in Section I, <u>supra</u>, State Farm's interpretation of Section 400.9905(4)(g) is erroneous and Dr. LaRocca had no duty to "ensure" compliance with all state and federal laws.

State Farm further failed to satisfy its burden on summary judgment by relying on inapplicable case law. In its Summary Judgment Motion (and its Initial Brief), State Farm relies on <u>State Farm Mutual Automobile Insurance Co. v. First Care Solution, Inc.</u>, 232 F. Supp. 3d 1257 (S.D. Fla. 2017). (D.E. 257, p. 15-17, 24-25); (I.B. at 56-57). This case is inapposite. State Farm cites <u>First Care</u> for its argument that if a clinic fails to comply with the statutory exemption, all of its charges are unlawful and noncompensable. However, the clinic in <u>First Care</u> was *never* "wholly owned by a licensed health care practitioner," meaning the clinic was in obvious dereliction of the exemption's plain language. <u>See</u> § 400.9905(4)(g), Fla. Stat. (exemption applies only to clinic "that is wholly owned by one or more licensed health care practitioners").

Here, State Farm relied on a reading of the statute that contradicts the exemption's plain language and cited to *no case law* of any court ever reading into the exemption a requirement that the owner "ensure compliance" with the law. Barring any legal authority to support its novel interpretation of the statute, State Farm failed to show that it was "entitled" to judgment as a matter of law. See Whatley, 189 F.3d at 1313.

Additionally, the District Court properly denied summary judgment because there were genuine disputed issues of material fact. (D.E. 522, p. 70, District Court recognizing disputed factual issues). In their briefs, State Farm and the Coalition falsely assert that State Farm put forth "undisputed" evidence at the summary judgment stage that Dr. LaRocca or the Clinics were engaged in illegal kickbacks, which Appellees allegedly did not refute. (I.B. at 6, 8-9, 16, 23, 35, 40-41, 51-58); (A.C.B. at 4-5). That is not correct.

For example, Appellees presented evidence that the items listed on their credit card bills were purchased for networking events, charitable donations, and personal use, but in any case were **not** purchased to incentivize patient referrals. (D.E. 274, pp. 6-7; 274-1, p. 91). Appellees further presented evidence that the payments made to the third-party marketers were hourly wages that fluctuated based on the number of hours worked. (D.E. 274, pp. 3-4, ¶ 5). In fact, and contrary to its *ad nauseum* assertions in the Initial Brief that Appellees violated the law, State Farm never

proved, at summary judgment or at trial or at any other time, even a single violation of the AKS or the PBA. Regardless of which interpretation of the wholly owned exemption the District Court had adopted, summary judgment still would have been improper.

But even if, *arguendo*, State Farm *had* established the existence of illegal kickbacks (which it did not), summary judgment was still properly denied because State Farm did not meet its burden as the movant. State Farm failed to identify any specific claims submitted for reimbursement in violation of the AKS or the PBA.

United States ex rel. Greenfield v. Medco Health Solutions, Inc., 880 F.3d 89 (3d Cir. 2018), is instructive. In that case, a specialty pharmacy that provided home care for patients with hemophilia made annual donations of $200,000 to $550,000 over six years to two charities dedicated to individuals with hemophilia. Id. at 91. In return, the charities listed the pharmacy as an "approved vendor," instructed their members to "remember to work with our . . . approved providers," included hyperlinks to the pharmacy's website, and provided treatment centers with lists identifying the pharmacy as an approved provider. Id. at 91-92. A lawsuit was filed premised on the charitable contributions being made in violation of the federal Anti-Kickback Statute—which State Farm concedes is to be interpreted in the same manner as Florida's AKS and PBA (I.B. at 53)—and the pharmacy's alleged violation of the False Claims Act, which imposes liability for presenting "a false or

fraudulent claim for payment or approval." Id. at 92, 94. In affirming summary

judgment in favor of the pharmacy, the Circuit Court noted that, regardless of

whether the charitable contributions qualified as kickbacks (which, for purposes of

its analysis, the Court assumed they were), the plaintiff could not succeed in its False

Claims Act suit because it did not prove that any *claims* were submitted as a result

of the contributions:

> In [plaintiff's] view, a temporal connection is sufficient to
> prove a False Claims Act violation at summary judgment.
>
> . . .
>
> We disagree. A plaintiff cannot "merely ... describe a
> private scheme in detail but then ... allege ... that claims
> requesting illegal payments must have been submitted,
> were likely submitted[,] or should have been submitted to
> the Government." Instead, he must provide "evidence of
> the actual submission of a false claim" to prevail at
> summary judgment.
>
> . . .
>
> It follows that [plaintiff] may not prevail on summary
> judgment simply by demonstrating that [the pharmacy]
> submitted federal claims while allegedly paying
> kickbacks. Nor may he prevail by hypothesizing that at
> least some of [the charities'] recommendations must have
> been directed to federal beneficiaries because [the
> pharmacy] submitted claims for 24 federally insured
> patients during the relevant time period. Instead, he must
> point to at least one claim that covered a patient who was
> recommended or referred to [the pharmacy] by [the
> charities].

Id. at 98-100.

This commonsense approach of determining illegality on a claim-specific basis is harmonious with the purpose of the relevant statutes and their application in other cases.  See id. at 98-99 (collecting cases); State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC, 315 F. Supp. 3d 1291 (S.D. Fla. 2018) (on claim that arrangement for use of facilities between two entities violated the PBA and AKS, insurer was not entitled to summary judgment because it did not show that every claim submitted under that arrangement was an improper kickback).

Like in Medco Health, here State Farm premised its claims entirely on a number of alleged kickbacks paid over a period of time by marketers hired by Appellees.  However—and just like the provisions of the False Claims Act at issue in Medco Health—the statutes State Farm relies on all refer to specific **claims** being rendered unpayable if determined to be unlawful.  See §§ 400.9935(3); § 627.736(5)(b)(1)(b); § 627.736(17), Fla. Stat.

In fact, the AKS explicitly mandates different penalty levels based on the **number** of improperly submitted claims, thereby necessitating claim-specific proof of violations.  See § 456.054, Fla. Stat. ("Violations of [Section 456.054] shall be considered patient brokering and shall be punishable as provided in s. 817.505."); § 817.505(4)(a)-(c), Fla. Stat. (different levels of penalties based on specific number of patients procured by patient brokering or illegal kickbacks).  The requirement to

prove kickbacks on a patient-by-patient basis—explicitly adopted by the legislature—refutes the Coalition's suggestion that tying a kickback to a particular State Farm insured "would have been practically impossible." (A.C.B. at 4-5). If the legislature was concerned about whether individual claims of unlawfulness could be proven when it drafted the very statutes on which State Farm relies, which as State Farm and the Coalition note were designed with the specific intent of combatting fraud and protecting patients, then the legislature could have imposed a different standard of proof. But it did not do so.

Like the plaintiff in Medco Health, State Farm did not produce at summary judgment (or at any other time) any evidence of any claim submitted in violation of the AKS, the PBA, or any other law. In fact, State Farm never produced evidence of any particular claims *whatsoever* that it alleged to be unlawful, opting instead to take an "all-or-nothing" approach that *none* of the claims were payable based on its reading of the wholly owned exemption.

By trying to ease its burden of proof and staking its entire claim on an improper interpretation of the wholly owned exemption, State Farm chose not to offer evidence of any specific claims that it might have contended were unlawful when submitted for reimbursement, if any existed. The approach was to State Farm's own folly and rendered it impossible for State Farm to succeed on its claims absent the District Court adopting State Farm's interpretation of Section

400.9905(4)(g). Because the District Court rightfully rejected State Farm's interpretation of the wholly owned exemption, see Section I, supra, it also rightfully denied summary judgment. And even if the District Court *had* accepted State Farm's argument, there were still factual disputes as to whether any of the alleged payments constituted illegal kickbacks, precluding entry of summary judgment. State Farm then affirmatively abandoned this claim before trial, so the factual dispute was never resolved. Thus, the District Court properly denied summary judgment, and its ruling should be affirmed.

## B. State Farm Presented or Abandoned All Triable Claims.

Contrary to State Farm's assertions, the District Court did not "prohibit" State Farm from advancing any claims or theories at trial. (I.B. at 58). There was simply no way for State Farm to succeed based on its chosen strategy.

State Farm mischaracterizes the District Court's ruling on the Reconsideration Motion as one directing judgment as a matter of law in favor of Appellees, likely in an effort to circumvent the abuse of discretion standard of review. (I.B. at 7, 22); see also Makro Cap. of Am., Inc., 543 F.3d at 1261. Likewise, the Coalition suggests that the District Court prohibited State Farm from presenting evidence at trial that any of the claims submitted to State Farm were made in violation of the Clinic Act. (A.C.B. at 6, 24-25). The District Court did neither of those things.

Instead, the District Court determined, correctly, that *as a matter of law*, State Farm could not succeed on its premise that *all* claims submitted to State Farm were noncompensable because Dr. LaRocca had an affirmative duty to **ensure** the Clinics' substantial compliance with all state and federal laws, which he allegedly violated. (D.E. 420, p. 9; "Moreover, for purposes of clarification, it is a matter of law as to whether the language of section 400.9905(4)(g) provides a licensing requirement such that failure of an entity to comply with all federal and state law acts as a revocation of the wholly owned exemption and a concomitant unlicensed, unlawful operation of the entity, not a question of fact for a jury, and the Court finds that the statute as a matter of law does not so operate.").

The cases cited by State Farm and the Coalition are inapposite. (I.B. 58-59 (citing State Farm v. Silver Star Health & Rehab, Allstate Insurance Co. v. Vizcay, and State Farm v. Performance Orthopaedics & Neurosurgery, LLC)); (A.C.B. at 24-25 (citing Gov't Emps. Ins. Co. v. DG Esthetic & Therapy Ctr., Inc., and Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.)). None of those cases involved a novel interpretation of the Clinic Act. Instead, they all involved a binary determination of fact: either the alleged condition existed, or it did not. See Silver Star Health & Rehab, 739 F.3d 579, 585 (11th Cir. 2013) (question regarding ownership of clinic); Vizcay, 826 F.3d at 1331-32 (question of whether medical director performed certain enumerated duties); Performance Orthopaedics & Neurosurgery, LLC, 315

F. Supp. 3d at 1304-05 (question of whether the owner was supervising the clinic); DG Esthetic & Therapy Ctr., Inc., 2019 WL 1992930 (S.D. Fla. Apr. 19, 2019) (question of whether a legitimate medical director was appointed and fulfilling his enumerated duties); Right Spinal Clinic, Inc., 2022 WL 2466039 (M.D. Fla. July 6, 2022) (question of whether medical director was systematically reviewing billing). Conversely, in the case below, the relevant question was the meaning of "legally responsible" as used in the Clinic Act. That determination is within the province of the court, and **not** the jury. See United States v. F.E.B. Corp., 52 F.4th 916, 932 (11th Cir. 2022) ("[S]tatutory interpretation is a legal question for a judge, not a factual question for the trier of fact.").

If the District Court had agreed with State Farm's interpretation of the Clinic Act as to the duties placed on Dr. LaRocca, then *and only then* should the jury determine whether Dr. LaRocca had violated those duties. That did not happen because the District Court correctly rejected State Farm's interpretation of the Clinic Act. Thus, there was no need, or even basis, for the jury to determine that issue.

State Farm *could have* presented evidence as to specific claims that were submitted because of allegedly improper "kickbacks" stemming from allegedly improper marketing efforts. Such evidence, if it existed, might have been sufficient to render any such specific claims noncompensable if there were no issues of fact, or if at trial the jury found for State Farm on individual contested claims. See

generally §§ 400.9935(3), 627.736(5)(b)(1)(b), 627.736(17), Fla. Stat.  State Farm did not do this.  Instead, State Farm affirmatively *abandoned before trial* its kickback and patient brokering claims, despite the District Court confirming and in fact encouraging that State Farm could still proceed with those claims, and instead chose to proceed only as to the medical necessity of the treatments.  (D.E. 449, pp 27-30).  State Farm's assertion that it was precluded from presenting evidence of violations of the Clinic Act because of the District Court's ruling on the Reconsideration Motion is, at best, disingenuous.

State Farm's attempt to reclassify the issues below is nothing more than hollow compensation for its own tactical mistakes at trial.  State Farm attempted to shortcut its burden of proof; instead of attempting to prove which specific claims were noncompensable based on violation of the Clinic Act, State Farm made the high-stakes argument that *all* of Appellees' claims were noncompensable.  This argument was based on an incorrect interpretation of the Clinic Act.  That State Farm's imprudent and unsuccessful trial strategy failed is not a basis to overturn the judgment herein.  See Scala v. City of Winter Park, 116 F.3d 1396, 1401–02 (11th Cir. 1997) ("That Scala made the strategic choices he did is no reason for us to abandon our . . . precedents."); Kokesh v. Am. S.S. Co., 747 F.2d 1092, 1096 (6th Cir. 1984) ("That a different strategy might possibly have produced a different result does not provide any basis for reversal.").  Affirmance is proper.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that this Court affirm the judgment on appeal.

Respectfully submitted,

/s/ *Lindsay Patrick Lopez*
Marie Tomassi
Florida Bar No. 772062
Bradley A. Muhs
Florida Bar No. 112102
Patrick M. Causey
Florida Bar No. 86443
Lindsay Patrick Lopez
Florida Bar No. 0022839
Trenam, Kemker, Scharf, Barkin,
  Frye, O'Neill & Mullis, P.A.
200 Central Avenue, Suite 1600
St. Petersburg, FL 33701
Phone: 727-820-3952 / Fax: 727-820-3972
Attorneys for Appellees

## CERTIFICATE OF COMPLIANCE

As required by Rule 32(g)(1) of the Federal Rules of Appellate Procedure, I hereby certify that this Answer Brief of Appellees is in compliance with the type form and volume requirements. This Brief was prepared using Microsoft Word 365. It is proportionately spaced; uses a Roman-style, serif typeface (Times New Roman) of 14-point; and contains 12,988 words, exclusive of the material not counted under Rule 32(f) of the Federal Rules of Appellate Procedure.

/s/ *Lindsay Patrick Lopez*
Attorney for Appellees

## CERTIFICATE OF SERVICE

I certify that the foregoing Answer Brief of Appellees was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit and served on all parties of record by using the appellate CM/ECF system on April 29, 2024. The Answer Brief was also dispatched by Federal Express to the Clerk of Court on April 29, 2024.

/s/ *Lindsay Patrick Lopez*
Attorney for Appellees